81 Cal.Rptr.2d 354 (1999)
69 Cal.App.4th 41
In re JULIE M. et al., Persons Coming Under the Juvenile Court Law.
Orange County Social Services Agency, Plaintiff and Respondent,
v.
Lorraine K., Defendant and Appellant.
No. G023194.
Court of Appeal, Fourth District, Division Three.
January 11, 1999.
Review Denied April 28, 1999.[*]
*355 Janette Freeman Cochran, under appointment by the Court of Appeal, Pasadena, for Defendant and Appellant.
Laurence M. Watson, County Counsel, and Ward Brady, Deputy County Counsel, for Plaintiff and Respondent.
Harold LaFlamme and Craig E. Arthur, under appointments by the Court of Appeal, Santa Ana, for the Minors.

OPINION
CROSBY, J.
Lorraine K. appeals from the order on the six-month review hearing. She claims she was denied reasonable reunification services, and she challenges the amended visitation plan requiring consent by her children. We find no merit in the first contention, but reverse on the second because it unlawfully delegates judicial authority to the minors.

I
Appellant Lorraine K. has three children who are the subject of these dependency proceedings: Julie M., now 14 years old; Katelyn W., now 10 years old; and Michael K., now almost 6 years old. Each child has a different father, none of whom is a party to this appeal.
Lorraine has an ongoing history of drug abuse and assaultive behavior. The children were detained at Orangewood Children's Home following an incident in March 1997, when she locked Julie inside the house and shouted obscenities at her for having called the police. She warned Julie, "[Y]ou fuckin' bitch. If you leave with the fuckin' police, you'll never be allowed back in this fuckin' house again."
Lorraine habitually used profane and derogatory language in front of Julie, calling her a "slut" and talking to her about sexual encounters with men. She once said in her presence, "Julie likes sex as much as I do, she's got the perfect body for it." Julie saw Lorraine smoke marijuana on several occasions and knew where she kept marijuana inside her apartment. In January 1997, after Julie brought her mother's marijuana pipe to school and showed it to a school counselor, Lorraine went to the school and started screaming "at the top of her lungs" in front of a group of sixth graders. She also shouted at the Orangewood staff while Julie was on the telephone, stating, "[I] might as well say good-bye forever, good-bye Julie."
Katelyn's situation was even worse. Not only was Lorraine profane, but she physically abused her, throwing things and hitting her on the back, head and face, leaving red marks and bruises.
Lorraine admitted to a history of drug abuse, including methamphetamine and marijuana. She tested positive for methamphetamine on three separate occasions in May 1997.
Lorraine pleaded no contest to the amended petitions, and the court found the allegations to be true at the combined jurisdictional and dispositional hearing in June 1997. The court adopted the Orange County Social Services Agency (SSA) recommendations regarding reunification services, including weekly counseling, a parenting class, a drug treatment program, and weekly monitored visits. The court required Julie and Katelyn's consent before visits or telephone calls *356 with Lorraine. Lorraine did not appeal the findings and orders made at the dispositional hearing.
The three children were placed with Katelyn's father, William W. Lorraine engaged in weekly monitored visits between June and September 1997 with the children. In September Julie refused any visits. Both Julie and the assigned social worker reported that Lorraine would curse and swear during conversations. Julie refused all visitation after a 30-minute Christmas visit in December 1997, at which Lorraine yelled at the social worker in the children's presence. Lorraine saw Katelyn three times in January 1998, but Katelyn thereafter refused to see her mother.[1]
On March 18, 1998, minors' counsel obtained a restraining order barring Lorraine from contacting or disturbing the children, and requiring her to stay at least 500 yards from them.
The statutorily prescribed six-month review (Welf. & Inst.Code § 366.21, subd. (e)) was held on March 25, 1998.[2] The court received into evidence four SSA reports, and heard testimony from Lorraine, the two assigned social workers, and court-appointed psychologist Jane Mak, who conducted an Evidence Code section 730 evaluation. Both Julie and Katelyn also made statements under Welfare and Institutions Code section 399.
Mak recommended Lorraine resume monitored visitation because "both girls have an attachment to their mother and enjoy being in her company." Although she viewed Julie to be "certainly mature for her age," she feared that giving her absolute decisionmaking responsibility would create "undue and unintentional pressure and stress.... [I] would ... consider what Julie says and feels... and work on all that within therapy as well, but ... not necessarily leave the final decision ... [in] her lap."
Both girls testified they wanted to continue living with William W. ("Bill is like my father"), and did not want visits with Lorraine. Given her mother's past abuse, Julie explained she was not "ready" to resume a normal relationship, but that "maybe once all this stuff gets over, then maybe I might want to have a relationship with her and see if she can change...." Katelyn said, "[I]f I go back to my mom's, my mom will just hit me."[3]
The court found reasonable services had been provided to Lorraine and that she "has not progressed adequately or satisfactorily in her own campaign...." The court initially allowed the minors' therapist to override each child's wishes regarding visits. The court ruled that the children's current therapist should act with a "direction and goal ... towards reunification in terms of visitation with the mother. The therapist is, within that context, to utilize a therapist [sic] judgment as to when the visitation is best suited to take place. The therapist will control that time and place." Considering the girls' feelings, the therapist would allow monitored visits in a therapeutic setting within an eight month time frame. Lorraine was ordered to undertake "extensive" individual therapy as well, "and we'll see how mom does, so she can show us objectively aside from those things that she says how well she's doing and her intent to participate in the lives of her children."
The court changed this ruling apparently after Lorraine abruptly walked out of the courtroom and was ordered by the bailiff to return ("you have shown me ... that you haven't learned a thing"). While still directing family reunification, the court gave Julie *357 and Katelyn the option to consent to, or refuse, any future visits with their mother.

II
Sufficient evidence supports the court's finding that "reasonable services" were provided to Lorraine in the period preceding the six-month review. We construe all reasonable inferences in favor of the juvenile court's findings regarding the adequacy of reunification plans and the reasonableness of SSA's efforts. (Angela S. v. Superior Court (1995) 36 Cal.App.4th 758, 762, 42 Cal. Rptr.2d 755 ["with regard to the sufficiency of reunification services, our sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered"].)
Lorraine did not challenge the court's order at the June 1997 dispositional hearing that the girls "consent" to any contact with her. That order followed several incidents in May and June 1997 where Lorraine shunned Julie and Katelyn while lavishing affection on Michael and later told SSA "I don't need to talk to my children, no more, their relationship with me is over."
By failing to appeal, Lorraine has waived any complaint she may have regarding the plan as ordered. (John F. v. Superior Court (1996) 43 Cal.App.4th 400, 404-405, 51 Cal.Rptr.2d 22.) Having declined to seek appellate review of the dispositional order, and having failed to file a petition to modify the dispositional order (Welf. & Inst.Code, § 388), Lorraine cannot fault SSA for complying with it.
Lorraine still says, however, that SSA should have tried to "work out the problems" by talking Julie and Katelyn into continuing to see her, even though they strongly opposed doing so. But the children's fears were real; Lorraine was physically aggressive, angry, abusive, foul-mouthed and threatening. Social worker John Aliberti described Katelyn's visit with the mother as "very strained." She continued to use profane language during a telephone call with Julie in August 1997.
Indeed, Lorraine's behavior so upset and scared the girls that minors' counsel secured a restraining order in March 1998. Julie declared, "I have seen my mother across the street watching our house" and she "goes to my school weekly to get my grades.... I am afraid that wherever I go my mother can just show up and say she is my mother and take me." Julie subsequently told the social worker she was "freaked out" and "scared" because "I think my mother's following me." Lorraine's car was repeatedly seen by Julie's friends around the neighborhood and by the school. Katelyn described how Lorraine stalked them, stating, "We always see my mom ... parked in the big lot by the store, and I can see her there from my room. [¶] She keeps coming to my school, even though I said I didn't want her to."
Even Lorraine's counsel agreed in her closing argument "that the girls do have a legitimate reason to fear their mother, perhaps based on some activity or behavior in the past...." She concluded, "I'm not down[]playing what's happened to these girls, because ... this mother has done things in the past to these children that could cause them to be afraid of her."
Despite these complicating factors from Lorraine's "emotional instability, and interpersonal relationships that place[d] both herself and her children at risk" (Angela S., supra, 36 Cal.App.4th at p. 761, 42 Cal. Rptr.2d 755), the evidence shows SSA still fostered a personal connection between mother and daughters. Social worker David Pless testified he "continue[d] to encourage the children to visit." His court report, dated January 23, 1998, expressed "the hope of the undersigned social worker that with the mother's cooperation a relationship between the girls and their mother can be fostered through written correspondence and possibly cassette and videotaped messages from the mother to her daughters." SSA's efforts were more than adequate.
Neither can we overturn the finding regarding "reasonable services" based on Lorraine's request for individual counseling. The correct rule is this: "In almost all cases it will be true that more services could have been provided more frequently and that the *358 services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (In re Misako R. (1991) 2 Cal.App.4th 538, 547, 3 Cal.Rptr.2d 217.)
The service plan required SSA to provide referrals to "appropriate resources to facilitate the mother's ... compliance with the case plan." She had been sporadically seeing a Dr. Woo for "parenting skill building" for several months between June and September 1997, but his contract expired, preventing further sessions.
Lorraine then requested a new referral, but the social worker decided to wait until mid-December, when her psychological evaluation would be completed. By then, the case had been transferred to a new social worker, who directed her to reenroll in the counseling program at Anaheim Perinatal, which included a component for individual therapy.[4] Lorraine did not enroll in this program until late February 1998 because "I'm working two jobs...." As the minors' counsel points out, "[d]uring the entire time that Mother complains about a lack of individual counseling, she could have had such counseling had she remained in the Perinatal Program. By her own volition, she avoided the services she was provided."[5]

III
The juvenile court did abuse its discretion in giving the children absolute discretion to decide whether Lorraine could visit with them. The order essentially delegated judicial power to the children  an abdication of governmental responsibility which was disapproved even in In re Danielle W. (1989) 207 Cal.App.3d 1227, 1235, 255 Cal. Rptr. 344. (See also In re Christopher H. (1996) 50 Cal.App.4th 1001, 1009, 57 Cal. Rptr.2d 861 ["when the court delegates the discretion to determine whether any visitation will occur [it has] improperly delegate[d] its authority and violate[d] the separation of powers doctrine"].)
In re Jennifer G. (1990) 221 Cal.App.3d 752, 270 Cal.Rptr. 326 involved an order delegating the power to order visitation to the county department of social services. The Court of Appeal reversed because of the court's failure to exercise its judicial function to define the rights of the parents to see the children.
Similarly, In re Donnovan J. (1997) 58 Cal.App.4th 1474, 1475, 68 Cal.Rptr.2d 714 reversed an order that a father has "`no visitation rights ... without permission of minors' therapists.'" The order constituted an unlawful delegation of judicial authority because "it conditions visitation on the children's therapists' sole discretion. Under this order, the therapists, not the court, have unlimited discretion to decide whether visitation is appropriate." (Id. at p. 1477, 68 Cal. Rptr.2d 714.) If it is an abuse of discretion to give either therapists or social services departments "complete and total discretion to determine whether or not visitation occurs" (In re Danielle W., supra, 207 Cal. App.3d at p. 1237, 255 Cal.Rptr. 344), how much more so to delegate such discretion to impressionable and psychologically scarred children.
Visitation rights arise from the very "fact of parenthood" and the constitutionally-protected right "`to marry, establish a home and bring up children.'" (hi re Jennifer G., supra, 221 Cal.App.3d at pp. 756-757, 270 Cal.Rptr. 326.) When the state removes children from their parents, it is obliged to make reasonable efforts to reunify the family. (In re Dylan T. (1998) 65 Cal. App.4th 765, 769, 76 Cal.Rptr.2d 684 [reversing order precluding incarcerated jail visitation because of child's young age]; In re Luke L. (1996) 44 Cal.App.4th 670, 52 Cal. Rptr.2d 53 [reversing order placing minors with relatives in Southern California when mother lived in Northern California].)
*359 An obvious prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children "as frequent[ly] as possible, consistent with the well-being of the minor." (Welf. & Inst.Code, § 362.1, subd. (a); Cal. Rules of Court, rule 1456(e)(2).) As Lorraine's counsel argued, "if the situation is as it now is and the girls are refusing to come and see their mother, things are never going to get better, and reunification services are just going to be a moot point for mother. These girls will never want to see mother. As the time goes by, not seeing her, the fears are just going to increase, because they're not going to have time around her, and the anxieties are going to increase...." (See also In re Brittany S. (1993) 17 Cal.App.4th 1399, 1407, 22 Cal.Rptr.2d 50 ["By not providing visitation, SSA virtually assured the erosion (and termination) of any meaningful relationship between Sheri and Brittany."].)
Here, for example, the court found William W., the caretaker, to be "actively on a campaign to undermine the relationship between the children and the mother, that if he had his way, he would cut the mother completely out of the children's lives, and that she would never see them again." Giving the children unbridled discretion to control visitation could make them nothing more than pawns in his efforts "to hurt the mother for past, real or imagined, wrongs...." Such a visitation order could be misused to punish the mother rather than to protect the children.[6]
But a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of their well-being. (In re Joseph B. (1996) 42 Cal.App.4th 890, 900, 49 Cal.Rptr.2d 900.) While visitation is a key element of reunification, the court must focus on the best interests of the children "and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300." (In re Moriah T. (1994) 23 Cal. App.4th 1367, 1376, 28 Cal.Rptr.2d 705.) This includes the "possibility of adverse psychological consequences of an unwanted visit between mother and child." (In re Danielle W., supra, 207 Cal.App.3d at p. 1238, 255 Cal.Rptr. 344.)
We do not minimize the risks to the girls from contact with Lorraine. The evidence shows the children sustained legitimate emotional damage from her visits. These reactions may serve as a basis for curtailing or limiting future visits. The minors' counsel eloquently expressed the need of these children to "stability" and to "some peace."
That is why Danielle W. approved a visitation order which vested limited discretion in the county welfare agency to consider the children's desires regarding visits with their mother. The court found that an order vesting discretion in the agency and the children meant "[i]n the context of this case ... the children should not be forced to visit with their mother against their will and in no way suggests that the minors are authorized to do more than express their desires in this regard." (In re Danielle W., supra, 207 Cal. App.3d at p. 1237, 255 Cal.Rptr. 344, italics added.) Danielle W. recognized that a child's aversion to visiting an abusive parent may be a "dominant" factor in administering visitation, but it could not be the sole factor. (207 Cal.App.3d at p. 1237, 255 Cal.Rptr. 344.)
At a minimum, the court should refashion its order to provide SSA with "broad `guidelines as to the prerequisites of visitation or any limitations or required circumstances.'" (In re Moriah T., supra, 23 Cal.App.4th at p. 1377, 28 Cal.Rptr.2d 705 [affirming visitation order for "regular" visits between the father and the minors in a time, place and manner consistent with their well-being].) Such an order may assign the task of overseeing visitation to the SSA to "promptly respond to changing dynamics of the relationship between parent or guardian and child, which changes may dictate immediate increases or decreases in visitation or demand variations in the time, place and length of particular visits." (Id. at p. 1376, 28 Cal.Rptr.2d 705; see also In re Christopher H., supra, 50 Cal.App.4th 1001, 57 Cal.Rptr.2d 861 [approving *360 a visitation order giving the department a limited role in managing the details of "reasonable" visits between the minor and the parent].)
In this regard, the court may appropriately rely upon an evaluation by treating therapists of the children's emotional condition and evolving needs. (In re Chantal S. (1996) 13 Cal.4th 196, 51 Cal.Rptr.2d 866, 913 P.2d 1075.) That is because dependency courts "simply do not have the time and resources to constantly fine tune an order in response to the progress or lack thereof in the visitation arrangement, or in reaction to physical or psychological conduct which may threaten the child's well-being." (In re Moriah T., supra, 23 Cal.App.4th at p. 1376, 28 Cal. Rptr.2d 705.) But the ultimate supervision and control over this discretion must remain with the court, not social workers and therapists, and certainly not with the children. (In re Christopher H., supra, 50 Cal.App.4th at p. 1009, 57 Cal.Rptr.2d 861; In re Danielle W., supra, 207 Cal.App.3d at p. 1238, 255 Cal.Rptr. 344.)
The court's original visitation order properly balanced these competing concerns regarding Lorraine's rights to parenthood and the children's needs for safety. The modified order did not.

IV
A final word about the record. The court altered the visitation order following an incident with the mother. But the particulars are not described. We only know the court's reaction to what the mother did, not its cause. Obviously, the mother's conduct was material; it impelled the court to change its order. In dealing with so momentous a matter as the relationship between a parent and a child, it is incumbent upon the parties below, including the court, to establish a record which allows for meaningful judicial review, both by appellate courts and in subsequent dependency proceedings. Regrettably, that did not occur here.
The order is affirmed except as to the visitation order and that portion of the judgment is reversed with directions to proceed in accordance with the views expressed above.
WALLIN, Acting P.J., and BEDSWORTH, J., concur.
NOTES
[*] Chin, J., dissented.
[1] Lorraine later admitted that she "didn't know how to handle preteen [daughters]," and "[I] guess I always looked more and emphasized the bad more than emphasized the good." She admitted cursing and swearing in front of her daughters ("a curse word would come out during a sentence"), although she did not intend to offend them. She rationalized, "It's a normal thing in Iowa."
[2] The review was governed by Welfare and Institutions Code section 366.21, subdivision (e) as to Michael and Julie and section 364 for Katelyn, who resided with a parent.
[3] The psychologist herself recognized (with considerable understatement) that Julie's "had a long history with her mother, not all of which has been positive experiences."
[4] But the social worker did not investigate whether the perinatal counseling was tailored to meet Lorraine's needs regarding her case plan.
[5] We fail to understand how Lorraine can complain of the denial of reunification services on the basis that the father, William W., did not complete his case plan.
[6] The court-appointed psychologist believed the girls intuitively sensed William W.'s opposition to visiting Lorraine and so reacted to avoid "risking offending someone they cared about."