[No. B188248. Second Dist., Div. Eight. Sept. 18, 2006.]

In re HUNTER S., a Person Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
CHARMAINE K., Defendant and Appellant.

**COUNSEL**

Lori A. Fields, under appointment by the Court of Appeal, for Defendant and Appellant.

Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, and Pamela S. Landeros, Deputy County Counsel, for Plaintiff and Respondent.

**OPINION**

**BOLAND, J.**—A mother appeals from orders terminating her parental rights and denying a Welfare and Institutions Code section 388[1] petition seeking reinstatement of family reunification services based on the juvenile court's failure to enforce a visitation order, and effectively delegating sole discretion over visitation to her estranged son. We conclude the juvenile court erroneously abdicated its authority by delegating discretion over visitation to a third party, and abused its discretion in denying the section 388 petition seeking to rectify that error. For that reason, the orders terminating parental rights and denying the petition are reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2001, a dependency petition was filed regarding five-year-old Hunter S.[2] His mother, appellant Charmaine K., had been fighting with her boyfriend when she saw police officers and fled, leaving Hunter alone and without provisions in a filthy hotel room. In February 2002, the petition was sustained on one count each of domestic violence and an unsafe home environment. (§ 300, subd. (b).) Hunter was placed with his maternal grandmother, and his parents were given reunification services.[3]

---

[1] All further statutory references are to this code.

[2] The petition also involved Hunter's 16-year-old half sister, Danae C., who is not a subject of this appeal.

[3] Hunter's father is not a party to this appeal.

Charmaine made substantial progress and, in May 2002, Hunter was returned to her care. The progress was short-lived. In June 2002, Charmaine was incarcerated on charges of felony conspiracy and receiving stolen property. Hunter remained with his maternal grandmother. Respondent Los Angeles County Department of Children and Family Services (DCFS) reinstituted reunification services while Charmaine was incarcerated. Charmaine and Hunter maintained contact while she was in prison. During the period Hunter lived with his maternal grandmother, Charmaine and Hunter maintained the "loving close relationship" they had shared since Hunter's birth.

In November 2002, Hunter's maternal grandmother told DCFS she could no longer care for him. Hunter was placed with his paternal grandmother, Dyan S., where he remains. Charmaine continued communicating with Hunter through monthly letters, which he enjoyed receiving.

Charmaine complied with her case plan and completed a number of programs while in prison. However, by May 2003, the juvenile court found the maximum period for reunification services had expired, and Charmaine remained unable to care for Hunter due to her incarceration. Charmaine was released from prison in July 2003, and began living in a rehabilitation center where she was required to stay for a year. Hunter spoke with Charmaine a few times on the phone after her release, but began refusing to accept her calls. While he still enjoyed receiving his mother's letters, he did not write back. Hunter was in individual counseling at that time. He told his therapist he did not miss his parents and felt safe and comfortable living with his paternal grandmother. Hunter was angry with Charmaine for breaking so many promises to him, and was "tired of her lying to him." He was afraid he would be exposed to more abuse and neglect if his mother took him to live with her. Reunification services were terminated in July 2003, and a section 366.26 hearing was scheduled. The court ordered DCFS to set up "visitation for [Charmaine] as can be arranged through her program."

With Charmaine's consent, Dyan was appointed Hunter's legal guardian at the selection and implementation hearing in October 2003. Hunter was still participating in individual therapy, but continued to refuse to speak with or write his mother. Hunter also refused to visit her, despite efforts by DCFS, his paternal relatives and his therapist to get him to do so. Hunter was upset with his mother who lied and asked him too many questions. He consistently told DCFS: "I don't want to see her, nobody can make me do something I don't want to do." Hunter was adamant he did not want to live with Charmaine.

Over the course of the next few months, Charmaine remained sober and employed, and made every effort to remain stable and productive. She persevered in her efforts to visit Hunter, who refused almost all contact with her. For a postpermanency planning hearing in late April 2004, DCFS reported Hunter was still angry at Charmaine "because of what she did," and was not interested in having any relationship with his mother. Hunter's therapist, whom the child had seen for 37 individual counseling sessions since April 2002, told DCFS he simply did "not want to have visits with his mother." She said Hunter felt "safe and protected by his grandmother," and was afraid he would "lose the stability he has gained and [was] not willing to risk his safety." Hunter mostly refused even to speak about his mother. However, in one session in which he was asked about Charmaine, he lashed out at the therapist in an uncharacteristic and "extremely angry" manner. The therapist opined that Hunter's reaction was triggered by trauma he had suffered living with Charmaine. Hunter also refused to attend joint therapy with Charmaine. In all other respects, Hunter was thriving in his grandmother's care. He said he loved Dyan and wanted to be sure she would permanently care for him. Hunter told DCFS he was afraid Charmaine would try to take him back to live with her, and he had nothing but "bad memories" of life with his mother. DCFS reported Dyan was willing to pursue adoption.

At the April 2004 hearing, Charmaine's attorney informed the court Charmaine had not seen her son in about 17 months and wanted to visit him in a therapeutic or any other setting. Hunter's attorney assured the court his client's refusal to visit with Charmaine was not "coming from someone else," and requested the court "take it slow" with regard to visitation. The court noted it had a visitation order in place, but said that as "a practical matter we're certainly not going to force a child who is just absolutely refusing to visit." The court ordered DCFS to discuss the matter with Hunter's therapist in an attempt to move the issue forward at an appropriate pace, so joint counseling could take place. The court noted "it may well be that at some point we have to just move forward with the visitation, not leave it in Hunter's hands." However, the court declared it was not yet inclined to put that pressure on Hunter.

The next review hearing was held in late October 2004. Charmaine had continued to pursue her efforts to visit and/or talk to her son. Hunter, however, remained resolute. He steadfastly refused all contact with his mother, repeatedly telling DCFS "he never wants to see or talk to [her] . . . again . . . ." He refused to accept gifts Charmaine sent him, saying he "[didn't] want anything from [his] mother except for her to leave [him] alone." In other respects, Hunter was doing quite well. He was performing above his grade level at school, and was a candidate for the school's "gifted" program. He had an "extroverted, people-oriented personality," actively participated in classroom discussions and remained closely bonded to Dyan, with

whom he wanted to live forever. Dyan told DCFS that, even after he was adopted, she would ensure Hunter was able to see his mother and sister whenever he wanted to. Hunter had stopped seeing his first therapist for insurance reasons. Dyan was looking for a new one.

At the hearing, Charmaine's attorney informed the court that Charmaine was still experiencing difficulty obtaining visits with Hunter, wanted help from DCFS, and asked the court again to change its orders to enable her to get joint therapy with her son. The court refused the request. A section 366.26 hearing on the new permanent plan of adoption was set for April 2005.[4]

Dyan's home study was completed in October 2005. In the intervening months, Hunter steadfastly continued to refuse all contact with Charmaine, with the exception of one visit in January arranged by Hunter's paternal grandfather, the reports of which were decidedly mixed. Hunter continued to thrive in Dyan's care. The two had a strong emotional bond. Hunter felt safe with and protected by Dyan, and he wanted her to adopt him. Hunter's new therapist said he continued to have "extreme trust issues." After June 2005, Hunter refused to participate in individual therapy. He threw away any cards and letters his mother sent, and would not listen to her phone messages. At a hearing on August 23, 2005, Charmaine and her newly appointed attorney noted Charmaine still had not seen her son, and attempted to obtain visitation and/or joint therapy with Hunter. The child's attorney objected, stating past visits had "proven quite hurtful" to Hunter, who had asked that "he not have any contact with his mother." The court did not respond to or make any ruling on Charmaine's request. DCFS reported Hunter wanted to be adopted by Dyan and be "done already because [he was] tired of having the court and DCFS in [his] life."

In October 2005, for reasons unspecified in the record, Charmaine's counsel was again relieved and a third attorney appointed to represent her.

In late November 2005, Charmaine filed a section 388 petition seeking to vacate the selection and implementation hearing, and reinstatement of reunification services.

A combined hearing on the petition and section 366.26 took place December 9, 2005. The juvenile court took the matters under submission. In a decision issued December 16, 2005, the court denied the section 388 petition. It found that, although Charmaine had shown a substantial change of

---

[4] On November 8, 2004, Charmaine filed a notice of intent to file writ petition challenging the setting of the section 366.26 hearing. Charmaine contends her first attorney refused to help her and, as a result, the writ was dismissed as inoperative. At Charmaine's request, her first attorney was relieved and new counsel appointed on April 26, 2005.

circumstances, she had failed to demonstrate it was in Hunter's best interest that he be returned to her custody. The court found Hunter adoptable. It concluded Charmaine failed to establish the applicability of any exception under section 366.26, subdivision (c), and terminated parental rights. This appeal followed.

## DISCUSSION

Charmaine maintains: (1) the juvenile court failed to comply with its order regarding visitation, and improperly delegated its authority to her son; (2) the court had an opportunity to rectify its errors by granting her section 388 petition, and abused its discretion by failing to do so; and (3) the lack of visitation deprived her of due process and effectively predetermined Hunter's permanent plan.

1. *Unless the juvenile court finds it would be detrimental to the child, visitation remains a pivotal component of the dependency scheme even after family reunification services are terminated, and the court may not delegate discretion over whether visits occur to a third person.*

■ Courts have long recognized that, in the context of dependency proceedings, a lack of visitation may "virtually assure[] the erosion (and termination) of any meaningful relationship" between mother and child. (*In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1407 [22 Cal.Rptr.2d 50].) Even after family reunification services are terminated, visitation must continue unless the court finds it would be detrimental to the child. (§ 366.21, subd. (h).)

■ The Supreme Court has held the statutory procedures used for termination of parental rights satisfy due process requirements only because of the demanding requirements and multiple safeguards built into the dependency scheme at the early stages of the process. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256 [19 Cal.Rptr.2d 698, 851 P.2d 1307]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308 [19 Cal.Rptr.2d 544, 851 P.2d 826].) If a parent is denied those safeguards through no fault of her own, her due process rights are compromised. Meaningful visitation is pivotal to the parent-child relationship, even after reunification services are terminated. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 49 [81 Cal.Rptr.2d 354].) Under section 366.26, subdivision (c)(1)(A), the Legislature has provided a means by which even a parent to whose custody a child cannot currently be returned has a final chance to avoid termination of parental rights if she can show she

has maintained regular contact and visitation with her child, and the child would benefit from continuing the relationship. Obviously, the only way a parent has any hope of satisfying this statutory exception is if she maintains regular contact with her child. As Charmaine correctly points out, for the parent deprived of visitation, "it is a forgone conclusion that [she] is not going to be able to establish the exception or have any meaningful chance to avoid the termination of parental rights." A visitation order which fails to protect a parent's right to visit is illusory. If, as here, the court grants visitation, "it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact occur." (*In re S.H.* (2003) 111 Cal.App.4th 310, 313 [3 Cal.Rptr.3d 465].)

■ The court made no finding of detriment and granted Charmaine monitored visitation "as can be arranged." While the court granted visitation in theory, none was permitted in reality. This situation was, to some extent, the consequence of decisions made by Hunter's therapists to give the child time to come to terms with his negative feelings about Charmaine. In the end, however, Hunter himself was given virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476–1478 [68 Cal.Rptr.2d 714].) In no case may a child be allowed to control whether visitation occurs. (*In re S.H., supra*, 111 Cal.App.4th at pp. 317–318; *In re Julie M., supra*, 69 Cal.App.4th at p. 48.)

Charmaine consistently raised the issue of the juvenile court's failure to enforce its visitation order for over two years. Through her attorney and her own letters, she complained to DCFS and the court itself, but received no assistance in response. While the original visitation order was never changed, neither was it enforced. At one hearing the court stated that, although "from a legal standpoint" it had made a visitation order, from a "practical standpoint" it did not believe it had the power or duty to ensure visits actually took place. Instead, the court impermissibly abdicated its duty, delegating to Hunter's therapist and to Hunter the power to decide whether, when and how the case would "move forward" with visitation. (See *In re Julie M., supra*, 69 Cal.App.4th at p. 51 [The "ultimate supervision and control over this discretion must remain with the court, not . . . therapists, and certainly not with the children"].) The visitation order was never enforced simply because Hunter continued to refuse any contact with his mother. This failure to enforce the order was error. (*In re S.H., supra*, 111 Cal.App.4th at pp. 318–320; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138–1139 [106 Cal.Rptr.2d 465] ["[V]isitation may not be dictated solely by the child involved"].)

*2. The juvenile court erred in denying the section 388 petition.*

Charmaine asserts the juvenile court's refusal to grant her section 388 petition was an abuse of discretion because it was the court's last opportunity to rectify three years of errors in failing to enforce the visitation orders, errors which led inexorably to erosion of the intimate bond she once shared with her son. We agree.

■ Section 388 plays a critical role in the dependency scheme. Even after family reunification services are terminated and the focus has shifted from returning the child to his parent's custody, section 388 serves as an "escape mechanism" to ensure that new evidence may be considered before the actual, final termination of parental rights. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 [65 Cal.Rptr.2d 495].) It "provides a means for the court to address a legitimate change of circumstances" and affords a parent her final opportunity to reinstate reunification services before the issue of custody is finally resolved. (*In re Marilyn H., supra,* 5 Cal.4th at p. 309.) Section 388 is central to the constitutionality of the dependency scheme. (*In re Marilyn H., supra,* at p. 309.)

Charmaine insists the juvenile court applied the incorrect standard in deciding her petition. Its persistent failure or refusal to enforce the visitation order—the only vehicle that would permit her to begin to repair and rebuild the close bond she indisputably once shared with her son—effectively predetermined the result and eviscerated the very "escape mechanism" section 388 was designed to provide. It was that failure to enforce the order that Charmaine brought to the court's attention in her petition. She points out that, by refusing to enforce its order, the court effectively denied her visits, joint therapy, and virtually all contact with her son during the short period in which their once close relationship was salvageable. She asked the court to rectify that error by continuing the permanency planning hearing and reinstating reunification services to give her the first bona fide opportunity to attempt to restore the bond she and her son had shared for a substantial portion of his life. The court refused her request.

The juvenile court denied Charmaine's petition because she failed to show it was in Hunter's best interest to be returned to her custody.[5] It found Hunter

---

[5] In so doing, the court actually denied a request Charmaine never made. The section 388 petition asked only that the permanency planning hearing be vacated and reunification services be reinstated to allow her to actually partake of visitation she had been granted but never received. Contrary to misstatements in the court's order, Charmaine did not ask that Hunter be immediately returned to her "custody" or "care."

wanted "nothing to do with his mother." The court opined that Hunter's negative feelings about his mother were a current manifestation of residual damage from poor choices Charmaine made early in her son's life. It dismissed Charmaine's plea, stating she did not "appear to understand, let alone accept the responsibility for Hunter's current emotional state." It denied the petition concluding "years of therapy had not changed Hunter's position," no evidence indicated his feelings toward Charmaine would change "anytime soon," and it was "unrealistic to believe that after one visit Hunter [would] melt into the arms of his mother."

The juvenile court's reasoning stood section 388 on its head. By not enforcing its visitation order and delegating the discretion as to whether any visits occurred to others, the court effectively denied Charmaine any postre-unification opportunity to repair her relationship with her son. The court then pointed to Charmaine's absence from Hunter's life to explain the lack of a parental relationship, during a period in which he had become closer to and felt more secure with Dyan. This development, in turn, was used to justify the court's finding that it was not in Hunter's best interest to grant the petition because there was no chance Charmaine could regain custody.

■ The juvenile court applied the incorrect test. It focused on the absence of contact or current bond between Charmaine and her son. But, it was unfair to apply this standard when Charmaine had been denied any chance to satisfy the contact requirement. The primary thrust of the petition was that, by virtue of three years of error and judicial inattention, she had been deprived of the opportunity to revive her relationship with her son, even though, during that entire period, a valid visitation order remained in effect and she had repeatedly raised the issue with the court. Charmaine asked the court to take this final opportunity to rectify the error, continue the permanency planning hearing, and reopen reunification services to give her a final chance to determine if her relationship with Hunter was salvageable. The court had the power to grant that relief. (See *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 [118 Cal.Rptr.2d 118] [juvenile court may continue any hearing on showing of good cause, including where no reasonable reunification services have been provided a parent].)

■ In light of the foregoing, we conclude the juvenile court's denial of Charmaine's section 388 petition was an abuse of its discretion. Although each stage in the dependency process serves a particular purpose, all stages are part of an overall process and an ongoing case. No stage may be considered in a vacuum. "The dependency scheme, when viewed as a whole, provides the parent due process and fundamental fairness while also accommodating the child's right to stability and permanency." (*In re Marilyn H.,*

*supra*, 5 Cal.4th at p. 307.) Significant safeguards are built into the dependency scheme. Once reunification services terminate, the " 'escape mechanism' " provided by section 388 is, effectively, the final opportunity available to a parent to demonstrate the possibility circumstances may have changed enough to warrant further reconsideration of reunification. (5 Cal.App.4th at p. 309.) By virtue of the court's persistent failure or refusal to enforce its visitation order, Charmaine was denied any chance to demonstrate the bond she once held with her son might be salvageable. By failing to rectify its errors and grant the section 388 petition, the court deprived Charmaine of crucial benefits and protections of the dependency scheme, essentially ensuring the termination of parental rights. Through no fault of her own, Charmaine was denied any opportunity to invoke the "escape mechanism" of section 388 in order to attempt to lay a foundation to establish the pivotal "best interests" prong of the essential beneficial relationship exception of section 366.26, subdivision (c)(1)(A), which can only be established through consistent contact and visitation. In short, termination of parental rights was a forgone conclusion.

The order denying the petition must be reversed. Because of this, the order terminating parental rights also must be reversed. (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1263 [101 Cal.Rptr.2d 548], disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396 [2 Cal.Rptr.3d 683, 73 P.3d 541].) Our reversal of the order terminating parental rights based on the error in denying the section 388 petition renders it unnecessary to reach Charmaine's due process arguments at this point.

 We conclude it serves Hunter's best interests to remand this matter and order the juvenile court to conduct a new hearing on Charmaine's section 388 petition in light of the fact that Charmaine was denied visitation during the period about which she complains. We are cognizant of the difficulties posed in a case such as this when a great deal of time has passed and a child refuses to visit with a parent who sincerely—but belatedly—wishes to maintain contact in an effort to rebuild a damaged relationship. Even under such admittedly problematic circumstances, absent a finding of detriment it is incumbent on the juvenile court to discharge its duty to ensure the parent's right of visitation is preserved, under conditions consistent with the child's well-being. In conducting a new section 388 hearing, given the passage of time and the consistent intensity of Hunter's resistance, it may be appropriate for the juvenile court to further consider if, under the circumstances and in light of current information, visits would be detrimental to Hunter. (Cf. *In re Julie M., supra*, 69 Cal.App.4th at p. 50.)

## DISPOSITION

The December 16, 2005 orders terminating parental rights and denying Charmaine's section 388 petition are reversed, and the matter is remanded to the juvenile court for further proceedings consistent with this decision.

Cooper, P. J., and Rubin, J., concurred.