Filed 10/7/21  In re S.F. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S.F. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G059959 |
| Plaintiff and Respondent, | (Super. Ct. Nos. DP026019-001 & DP026020-001) |
| v. | |
| CHERYL H., | O P I N I O N |
| Defendant and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Robert J. Gerard, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minors.

## INTRODUCTION

Mother Cheryl H. (Mother) appeals two trial court rulings reducing the frequency of visitation with her daughters, S.F. and M.F., both teenagers in long-term foster care placements, from weekly to twice monthly. The rulings occurred during contested postpermanency periodic review hearings pursuant to Welfare and Institutions Code section 366.3.[1] During the course of the minors' years-long dependency proceedings, Mother had never shown any diligence in following her case plan or addressing the issues leading to the minors' removal. And even after reunification services were terminated, her attendance at visits was inconsistent and her appearance at hearings sporadic. Additionally, Mother's behavior at visits was a long-running matter of concern for the court, court-appointed advocates, and social workers. In denying Mother more frequent visitation, the trial court rightly recognized the toll these patterns of conduct were taking on the girls. We therefore affirm the visitation orders.

## FACTS

The Orange County Social Services Agency (SSA) filed a noncustodial dependency petition against Mother in March 2015, when the girls were 10 and 8 years old. These proceedings have been pending ever since, and we have now reviewed rulings made in them on two previous occasions: in June 2016 (*In re S.F.* (June 21, 2016, G052753) [nonpub. opn.] and December 2016 (*In re S.F.* (Dec. 12, 2016, G053401) [nonpub. opn.]).[2] Both times, we affirmed findings, at both the dispositional hearing and subsequent six-month review hearing, that Mother posed a substantial risk to her daughters.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]     We therefore do not re-summarize the background of the proceedings from their inception through March 22, 2016, the date of the last ruling we reviewed, and we refer to our previous opinions for any questions about those earlier rulings.

Mother has a long history of interactions with SSA due to her neglect of her children, which includes failing to enroll them in school, failing to take them for regular medical and dental care, and secluding them in an unsanitary environment at home. The girls' father is deceased. By the time of the six-month review hearing on March 22, 2016 (the results of which we reviewed in our previous opinion), the juvenile court judge was pleading with Mother to take the steps necessary to get her children back.

In the meantime, due to behavioral issues, it was difficult to find stable placements for the girls. They had transitioned from group home to foster care and then to another group home because their needs were so demanding. Mother was given five hours of weekly supervised visitation, with the possibility of visits being increased or liberalized as appropriate. By May 2016, the time had been increased to eight hours of weekly monitored visitation. She was on time for these visits and acted appropriately with the children, bringing them coloring books, markers, and food, and playing games with them.[3]

However, monitors observed effects of Mother's untreated mental illness in these visits and her tendency to draw the children into her altered experience. Additionally, Mother canceled 10 visits and failed to show up for 3. Oftentimes, she would explain her inconsistencies by saying she had to care for her elderly mother, and the social workers felt she was not properly prioritizing visitation with her mother's needs. She also demonstrated a lack of follow-through in arranging certain logistical aspects of her visitation schedule.

In order to reunify with her daughters, Mother needed to make progress with her case plan, but she could not do so. She failed to attend required therapy sessions and parenting classes. She failed to attend required educational meetings for the girls. She could not seem to understand why the girls were removed from her care and blamed

---

[3] As noted in our previous opinions, Mother's adult son (the girls' half-brother), K.H., lived with her. K.H. would accompany Mother on many of her visits with the girls.

the dependency system and the children's caregivers or schools for her inability to reunite with them.

On August 23, 2016, the court terminated reunification services as it did not appear likely the children would be able to return to Mother's home. It set a termination hearing under section 366.26 for December 12, 2016. But in its report filed for the termination hearing, SSA opined that it would be detrimental to the girls' welfare to terminate Mother's parental rights. According to social workers, Mother's regular visitation and contact with the children was to their benefit, as they were still very bonded to her. Continuing her parental rights would not inhibit the process of finding them a permanent family placement.

In the meantime, SSA had managed to contact Demond F., the children's paternal half-sibling, in May 2016 and he cleared a background check to have face-to-face visitation with the children. The visits went well, and on December 1, 2016, Demond said he would like to be considered for placement. Because there were no other prospective legal guardians, and because of the children's behavioral needs, SSA recommended long-term foster care as the permanent plan.

At the section 366.26 hearing, the juvenile court stuck to these recommendations, finding termination of parental rights was not in the girls' best interest, and ordering long-term foster care. The record also indicates Mother was to continue with her then-current visitation schedule: eight hours of monitored visitation per week. While the children waited for placement, they would continue to be housed at the group home with reviews to take place every 15 days, and a periodic review scheduled for June 6, 2017.

By mid-January 2017, the girls were having successful overnight visits with Demond. Their deepening bond with him seemed to anger Mother, who began to make negative comments to the children at visits about him. This bothered S.F., who reported that Mother threatened to stop visiting her and her sister if they continued to visit with

4

Demond. When the social worker instructed Mother not to talk about the case with the children, Mother allegedly stated "I am their mother, I can say to them what I want."

On March 15, 2017, SSA requested that the court change Mother's monitored visitation to once per week, not only because of the inappropriate comments she would make at visits and her unwillingness to rein such talk in, but also because she was consistently late and missed several visits. Mother's behavior was negatively affecting S.F. She would make S.F. feel guilty, and S.F. was beginning to act out more and threatening self-harm. The juvenile court ordered mother to confirm visits 24 hours in advance or they would be canceled.

In late March 2017, the children were approved to be placed with Demond, his wife, Crystal F., and their young son. After services were put in place for the family, the girls transitioned to the new placement in April 2017.

In its status review report filed for the June 6, 2017 postpermanency periodic review hearing, SSA indicated the girls were doing very well. Demond and Crystal were going "above and beyond" to meet the children's needs and ensure they attended recommended appointments. Mother, on the other hand, was refusing to visit the girls in Demond and Crystal's home and lashing out at the social worker. Mother once reportedly got physical with the social worker and S.F. had to pull her back. She had missed 10 visits. She had also missed meetings related to M.F.'s education and had missed S.F.'s graduation. SSA again recommended that Mother's visitation be decreased to one three-hour monitored visit per week, since that was about how much she was averaging on a weekly basis anyway. However, after Mother's attendance and behavior at visits improved somewhat, the parties stipulated to twice weekly monitored visitation.

In September 2017, Demond was involved in a motor vehicle accident which left him hospitalized over several weeks. This took a great toll on the family, even though the girls continued to do relatively well in the placement. Mother by that time had only missed one visit and behaved appropriately, but routinely arrived late.

5

In March 2018, S.F.'s court-appointed special advocate reported the visits with Mother were becoming detrimental to S.F., because S.F.'s behavior would change after visits. She would blame others for her mistakes, lie, and act defiantly.

On April 10, 2018, the court held a visitation review hearing. This was precipitated by the submission of SSA's interim review report, which related continuing concerning behavior by Mother at visits. One visit on March 23, 2018 had to be terminated due to Mother's outbursts and comments, which S.F. mimicked, creating an untenable situation for the monitor. Mother reportedly told S.F. she didn't "have to listen to anybody" and should call the social worker to complain. The court reduced Mother's visitation to once weekly pending the periodic review hearing one month later on May 15, 2018.

Mother missed a scheduled visit with the children on April 27, 2018, which upset M.F. so much that she wrote a communication she hoped would be relayed to the judge about how sad her mother's actions made her feel. The court refused to increase Mother's visits back to twice weekly at the May 15 hearing because "there [wa]s absolutely no evidence" that it would be in the children's best interest to have more visits. The court stated its belief that the only reason SSA was not seeking to find detriment and terminate visits altogether was because the children wanted to see their mother, and commented: ". . . [I]t's sad that now the children are even realizing that Mom doesn't act appropriate. Mom doesn't show up to all the visits. They can't count on Mom."

Yet Mother's troubling behavior continued. In its interim review report dated August 3, 2018, SSA reported Mother had missed two visits. Additionally, she supplied the children with junk food, which was problematic because the girls' physician was concerned about their weight and health. Crystal, Demond's wife, also reported to the social worker that M.F. said Mother would allow her and S.F. to listen to voice messages on her phone, including messages from county employees, and would discuss inappropriate topics such as money. The social worker felt Mother's unwillingness to

6

respect rules or boundaries was harmful to the children, and she asked the court to "consider evaluating the appropriateness of continued weekly visitation[.]"

The situation was further complicated by Demond's accident, which had impacted the family's ability to care for M.F., who had by now been diagnosed as autistic. Demond and Crystal asked to keep S.F. but have M.F. placed in a separate home where she could get more individualized care. The children's service providers and social worker determined this change would be in both children's best interest. The court was on board with this, but Mother objected to the girls being separated. Instead, Mother wanted the court to order conjoint therapy with the girls so they could discuss the problems in the parent-child relationship. The court declined, stating this would be an unfair burden on the children when Mother was the one with the problem.

Mother did not react well to the change in M.F.'s placement. The status review report for S.F. dated November 6, 2018 stated Mother's attendance and tardiness at visits was again an issue. But now her visits with S.F. were becoming contentious because she blamed S.F. or made her feel guilty for her younger sister's removal from Demond and Crystal's home. And Mother would wait until the end of her visits to make such comments, essentially gaming the system so that her visit could not be terminated sooner for inappropriate behavior. Her mother's conduct toward her made S.F. disinclined to go through with visits and she missed several of them. Meanwhile, M.F. reported to both the social worker and S.F. that Mother said S.F. "doesn't love us anymore."

In an addendum report filed December 12, 2018, SSA reported some concerning news about S.F. Her attendance at visits with Mother had improved over the past month, but she was also having behavior problems. At one point, Crystal had found evidence on S.F.'s iPad that she had taken photos of other children's homework and had made an audio recording of a confidential meeting with the social worker. The social worker found this alarming not only because of the implications but also because "it is a

7

behavior that the mother has demonstrated." S.F.'s electronic devices were taken from her, and her behavior stabilized.

For her part, Mother maintained the SSA reports were not always accurately portraying her conduct at visits. Her counsel sought a hearing on S.F.'s placement with Demond and Crystal because of some confrontations that had occurred in the home. Mother contested some of the representations made in the November 15 report. In the end, the court felt the placement was appropriate even if certain parts of the report were considered inaccurate.

Despite her continuing habit of missing visits, Mother persisted in seeking an increase in her visitation to twice weekly. The court was open to this if SSA was able to report that Mother had gone a few months with regular and appropriate visits. But Mother had to show more of a concerted effort to make that happen.

This was not to be. As of the next review hearing on August 23, 2019, Mother had made little progress. M.F. and S.F. were having regular sibling visitation after M.F. was placed back with her previous foster family. But Mother was not consistent in attending visits with S.F. She failed to call to confirm visits as required and was unable to produce evidence of participating in therapy or other services. As for M.F., as of October 31, 2019, Mother had been a no-show for six visits and struggled to be on time, which understandably upset M.F. a great deal.

On January 29, 2020, SSA filed another status review report as to S.F. Crystal and Demond had separated and Demond had moved out. However, S.F. remained in the home with Crystal and her young nephew. S.F. did not seem to be too badly impacted by this change, and indeed, seemed to be maturing somewhat and gaining insight into her past. She was doing very well in school – getting all A's – was playing high school sports, and had seemingly overcome some of her previous behavior problems. She wanted to be a normal teenager, and was realizing her mother was not changing the circumstances which led to S.F.'s detention.

8

Mother again missed visits in the run-up to hearings in May 2020 and November 2020. For the May 2020 hearing, it was reported she had missed five visits with M.F., once again upsetting the child. For the November hearing, it was reported Mother had missed 9 out of 19 visits. M.F. was beginning to get very frustrated, saying she needed a break from Mother.

In its November 16, 2020 status review report regarding M.F., SSA sought to decrease Mother's visits to once monthly. Mother opposed this, and the court set a hearing on the matter for February 2, 2021. Pending the hearing, the court set visitation at twice per month, and gave SSA discretion to increase or liberalize visitation if the children so requested. Both M.F. and S.F. were agreeable to visits twice monthly. After the hearing on February 2, the court kept this schedule in place. It is the reduction of visitation from once weekly to twice monthly which Mother now appeals.

## DISCUSSION

If parental rights have not been terminated, as in this case, the juvenile court has an obligation to provide for visitation when it chooses a permanent plan for a dependent minor. (See § 366.26, subd. (c)(4)(C).) The court must balance "the interests of the parent in visitation with the best interests of the child" in defining the right to visitation. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) "In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation. The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*Ibid*.)

We can see no abuse of that discretion here. At the section 366.26 hearing, the juvenile court declined to terminate Mother's parental rights because the children were benefiting from relatively consistent weekly monitored visitation with her. She was permitted to continue with eight hours per week of such visitation.

9

Once proceedings enter the postpermanency review stage under section 366.3, the court is to consider, among other things, "[t]he continuing appropriateness and extent of compliance with the permanent plan for the child, including efforts to maintain relationships between a child who is 10 years of age or older and who has been in out-of-home placement for six months or longer and individuals who are important to the child. . ." (*Id.* at subd. (e)(3).) It is also to consider whether the parent has made progress on "alleviating or mitigating the causes necessitating placement in foster care." (*Id.* at subd. (e)(7).)

Mother's picture just kept getting worse instead of better. She lashed out at S.F. after she and her sister developed a positive bond with Demond and Crystal. She refused to respect boundaries on the types of conversations which were appropriate during visits. When M.F. was taken out of Demond and Crystal's home, Mother blamed S.F. and apparently pitted the sisters against one another. She was tardy for or missed many visits – so much so that the juvenile court reduced her visitation to once weekly. Her failures to appear for visits hurt M.F. to the point she wanted to write a letter to the judge.

Moreover, the needs of the girls changed over time. Both S.F. and M.F. had major behavioral issues and little social or educational grounding when they were first removed from Mother's care. But both girls took huge strides forward in the following years, eventually becoming good students. And it does not escape our notice that some of S.F.'s behavior problems began to return in 2018 when she was visiting with Mother on a more regular basis. Indeed, there was concern she might be mimicking Mother – for example, in the way she recorded a confidential meeting on her iPad. By 2020, both girls were realizing the negative impact their mother's behaviors and actions were having on them. They were finally experiencing some normalcy. And it no longer seemed as necessary to the court at that point that Mother have the same frequency of contact with the girls as she had previously.

10

Mother emphasizes the fact both S.F. and M.F. have expressed a desire to return to her care someday. She claims more frequent visitation will help preserve the bond between them. We cannot argue about the benefits of visitation on the parent-child relationship. But the benefits must work both ways. Even in the reunification stage of the dependency process, "the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376.) This includes the 'possibility of adverse psychological consequences of an unwanted visit between mother and child.' (*In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1238.)" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.) If the children were no longer benefiting from visits – indeed, if they were being hurt by them or by Mother's failures to follow through with them – it was fully within the court's discretion to reduce them.

Finally, we must point out that this is not the end of the road. The bi-monthly visitation order is not irrevocable. The juvenile court allowed SSA to increase the frequency of visits if the children request it. So if the children desire more contact with Mother, more frequent visitation is a possibility. And Mother may always file a section 388 petition to modify the visitation order based on changed circumstances in the future. The question in our minds is whether she is willing to do what is necessary to get such a petition granted. Over the six years that her children have been dependents, Mother has refused time and again to take ownership of her actions and demonstrate a sustained commitment to her own well-being, not to mention that of her children. Unless and until she does so, the juvenile court must do what it believes is best for them, and we are confident it has in this instance.

11

## DISPOSITION

The visitation orders are affirmed.



                                                  BEDSWORTH, ACTING P. J.

WE CONCUR:


FYBEL, J.


GOETHALS, J.