Filed 10/9/14  K.W. v. Super. Ct. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| K.W.,<br><br>　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>　　　Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY et al.,<br><br>　　　Real Parties in Interest. | A142557<br><br>(San Francisco County<br>Super. Ct. No. JD133063) |

**INTRODUCTION**

Petitioner K.W. (father) seeks extraordinary relief from an order of the San Francisco City and County Superior Court terminating his reunification services and setting a hearing under Welfare and Institutions Code[1] section 366.26 to select a permanent plan for his minor son, A.W.  Finding substantial evidence to support the findings challenged by father, we shall deny the petition for extraordinary writ on the merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 11, 2013, real party in interest San Francisco Human Services Agency (Agency) filed a dependency petition in the matter of A.W., born in April 1999, alleging

---

[1] All statutory references are to the Welfare and Institutions Code.

1

failure to supervise and protect the minor under section 300, subdivision (b). The petition notes minor was removed from father's care on March 7, 2013, for general neglect and caretaker incapacity.

According to the detention report, A.W. was removed from his parents' care in 1999 when both parents were using methamphetamines and after A.W. was exposed to drugs in utero. As a consequence, A.W. has special needs and is significantly developmentally delayed. Father, who has sole legal and physical custody of A.W., also has developmental delays, but it is unclear how much his limitations are due to his developmental delays as opposed to his drug use. On the day A.W. was removed from father's care, father took methamphetamines and was found on the floor at A.W.'s school, twitching and convulsing, and obsessively counting money. The week before the petition was filed, A.W. was found wandering on school grounds in clothes soiled with fresh and dried feces. The minor explained to staff that he had slept in a car the night before. The school gave him a change of clothes but he soiled himself again and had to be sent home. There have been numerous referrals indicating A.W. has urine and feces on his clothes; on one occasion, school staff sent the minor home with soiled clothes in his backpack only to find the dirty clothes still there two weeks later. Other referrals indicate father believed it was appropriate to use corporal punishment on his son, and that he had done so in front of the minor's schoolmates. Also, A.W. was consistently truant. On March 14, 2013, the court issued a detention order placing the minor in the Agency's custody until further order of the court.

The Agency filed a Disposition Report on April 15, 2013, recommending the allegations be sustained, the minor continue in foster care, and that father receive reunification services. The report states, "[A.W.] is a sweet 13 year old who presents as much younger developmentally and emotionally. . . . He attends [middle school] and is in a special day class for severely impaired students. . . . [¶] The minor is also adjusting well

2

in the foster home and is growing attached to his foster mother." He is able to use the toilet regularly with structure from adults. He is attached to his father but becomes anxious and aggressive during visits, and has difficulty responding to father's behavior and statements to him. Father had been attending two-hour supervised visits with A.W. every Wednesday at the First Stop Visitation Center. However visits for April 10 and April 17, 2013, were suspended due to father's behavior during visits, such as demonstrating "inappropriate boundaries, sexualized behavior, as well as cruel actions towards the minor."

In assessment, the disposition report states father presents "with signs of current and longstanding previous history of methamphetamine abuse," causing him "to act in an aggressive manner alternating with severe mood swings. He presents with cognitive concerns that were not previous[ly] diagnosed. He has inappropriate interactions with the minor and this has . . . caused psychological harm to [A.W.] that needs further assessment." The Agency disposition report recommended that, prior to reunification, father complete a drug-treatment program, participate in a mental health assessment, participate in individual psychotherapy, participate in a father's group and parenting education class, and obtain appropriate housing. Following a contested hearing on jurisdiction and disposition held on May 24, 2013, the court sustained the petition, ordered reunification services, and set a six-month review hearing for November 14, 2013.

On October 30, 2013, the Agency filed a six-month status review report recommending an additional six months of reunification services. The report states father was homeless, had refused suggestions to stay in a shelter or residential drug program, and shows "very poor internal coping skills." He has experienced periods of distress, is quick to anger, blames the Agency for not doing enough to assist him, and when he is upset his speech becomes unintelligible. However, father agreed to undergo a

3

neuropsychological evaluation to assess his executive functioning, the emotional impact on his functioning, and what services might benefit him. Father has not drug-tested since testing positive for methamphetamines on April 5, 2013, and has not participated in a substance abuse assessment. Father is very affectionate with A.W., is working with A Better Way on improving parenting skills, and regularly meets with the therapeutic visit clinician for collateral sessions after his visits with A.W.

In assessment, the Agency's six-month status report states father clearly loves A.W. and diligently attends visits. However, he has been resistant to reunification services and his "lack of emotional regulation" presents a barrier: "He is either calm, with short spurts of anger, or highly escalated . . . to the point where he becomes belligerent and threatening. He clearly does not trust . . . this agency. He feels a sense of entitlement," demanding housing and resorting to blame and threats when the social worker does not provide them. At the six-month review hearing held on November 14, 2013, the court adopted the Agency's recommendations, ordered an additional six months of services for father, and set a 12-month review hearing for May 15, 2014.

On January 14, 2014, the Agency filed an interim review report stating father underwent a neuropsychological evaluation with Dr. Katya Cornejo and was attending group counseling at the Latino Family Center while awaiting an opening at a residential drug-treatment program. Based on Dr. Cornejo's recommendations, the Agency proposed father be required to complete the following reunification services: (1) a residential drug-treatment program and drug testing, if deemed appropriate, for one year after completion of the program; (2) individual psychotherapy; (3) medical care for diabetes and high blood pressure (which was in progress); (4) mental health treatment; (5) participation in a father's group (which was in progress); (6) parenting classes (father was obtaining the equivalent through counselor Dima Dashevsky); (7) demonstrate an ability during visits to respond to A.W.'s developmental and emotional needs; (8) a year-

4

long basic living skills program, including how to find and keep a job, manage money, and find safe housing; (9) obtain and maintain appropriate housing; and (10) notify the social worker if mother was residing with him. The court adopted the Agency's recommendations on January 16, 2014.

Subsequently, in its 12-month status review report filed on April 25, 2014, the Agency recommended termination of father's reunification services. The Agency recommended termination because father had been in a residential drug program for less than 90 days in the year following detention, had engaged in services with A Better Way but actively used drugs during most of that engagement, and had not yet started individual therapy.

At the contested review hearing held on July 11, 2014, the court admitted the 12-month status review report into evidence during the testimony of social worker Jennifer Curley. Curley testified father had not completed a residential drug-treatment program and she could not confirm that father had begun individual therapy. Father had received parenting education with A Better Way and was learning basic living skills during his current residency at Walden House, a residential treatment program. Curley testified father has consistently and regularly contacted and visited with his son. However, Curley opined father had not made significant progress in resolving the problems that led to removal because those problems involved 30 years of methamphetamine use, chronic homelessness, and temper-management problems requiring "a lot of work and a lot of commitment over a long period of time."

Father presented several witnesses at the contested hearing. Consuelo Martinez is a community mental health worker with A Better Way, where she acts as family partner helping parents to learn self-advocacy, navigate social service systems, and bridge gaps in communication with service providers. Martinez described a "significant change" in father over time; specifically, father has learned to "stay regulated emotionally" by

5

utilizing breathing techniques she taught him, so that he can now remain calm in meetings and speak up for himself.

Eli Parson is a family case manager at the Homeless Prenatal Program. Parson helped father enter a Dependency Drug Court (DDC) program. Since March 2014, he has met with father on a weekly basis and interfaces with other service providers to report to the court on father's progress in treatment. Parson stated he received information from Walden House that father is in full compliance with his treatment program and attends all required groups and classes. Since entering the DDC program in December 2013, father's drug tests have all been clean.

Dima Dashevsky, a mental health clinician at A Better Way, testified that since April 2013 she has provided therapeutic visitation, a form of family therapy, between father and son twice a week in two-hour sessions. Dashevsky also has weekly collateral sessions with father prior to the therapeutic visits. In her therapy sessions, Dashevsky noticed a strong bond between father and son with "a lot of love in the room." The initial challenge in the therapeutic visits was to create more open communication and help father be more supportive in dealing with the minor's anxieties around transitions and changes. Dashevsky has seen a lot of progress by father "in the area of emotional attunement and in him staying more regulated, being able to contain his own feelings more, to be able to show up more fully for [the minor]." She has also noticed progress by father in other areas; he has been more consistent in setting limits for A.W. and also in respecting boundaries set by the minor.

On cross-examination, Dashevsky testified father becomes "disregulated" at times, meaning he is visibly upset and agitated, and A.W. isolates himself at those times. Also, whereas instances of rough play between father and son have diminished, they still occur once or twice a month during therapeutic visitations. The minor has consistently asked father not to engage in rough play, and part of Dashevsky's work with A.W. is to help

6

him be more assertive on that point. Dashevsky admitted father has a difficult time focusing on the minor's needs and keeps trying to engage him in rough play. She stated, in discussing past family traumas, father uses a "very stern and accusing voice" with the minor, which only increases the minor's anxieties. An "ongoing theme" in treatment is to help father "stay regulated and calm to be able to present and create more space for [the minor]'s feelings."

After receiving evidence and hearing the arguments of counsel, the court announced its findings and rulings as follows: "[T]here is no doubt that father has made progress and is demonstrating a desire to improve himself, his life skills, and that he is devoted to his son. [¶] But at this point I have to find that there is a substantial probability that he will reunite with his son within the next six-month review to authorize [further] services, and I can't find that." The court found father had failed to demonstrate an ability to respond to the minor's developmental and emotional needs in therapeutic visitation, noting that if father "can't do it in a therapeutic visitation, will he be able to do it in the outside world under all the pressures that affect people on a daily basis[?]" The court also expressed concern father had not undertaken individual psychotherapy because "underneath all the addiction issues we often find mental health issues that need to be addressed, and that hasn't been addressed at all. I know he is in some counseling, some family therapy with his son, but that doesn't really amount to individual therapy." The court found father was "not capable of taking care of" his son and stated "it's unlikely that in two months you would be capable of taking care of him."[2] Thereafter, the court terminated father's services but continued his visitation with the minor. The court found return of the minor to the parent's custody would create a substantial risk of detriment to

---

[2] Upon making the findings required by statute, the court could have extended services until the 18-month review hearing, which was due by September 7, 2014, 18 months from "the date the child was originally taken from the physical custody of his or her parent . . . ." (§ 366.21, subd. (g)(1).)

7

the safety, protection, or emotional or physical well-being of the child. Also, the court found by clear and convincing evidence that the Agency offered or provided reasonable services designed to help father overcome the problems leading to the initial removal and continued custody of the minor. The court scheduled a hearing pursuant to section 366.26 for November 12, 2014. Father timely filed a notice of intent to file a writ petition.

## DISCUSSION

### A. *Reasonable Services Were Provided*

Father challenges the juvenile court's finding that he received reasonable services. In reviewing that finding, we examine the record in the light most favorable to the juvenile court's order to determine whether there is substantial evidence from which a reasonable trier of fact could have made the finding under the clear and convincing evidence standard. (*In re Isayah C.* (2004) 118 Cal.App.4th 684, 694-695.) We construe all reasonable inferences in favor of the finding of adequacy of an agency's reunification plan and the reasonableness of its efforts. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 46.) We likewise resolve conflicts in favor of such a finding and do not reweigh the evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.) If the finding is supported by substantial evidence, we affirm the ruling, even though other evidence might support a contrary conclusion. (*In re Christopher L.* (2006) 143 Cal.App.4th 1326, 1333.)

Moreover, the Agency's duty is to make a " 'good faith effort' " to provide reasonable reunification services. (*In re Monica C.* (1994) 31 Cal.App.4th 296, 306.) Services may be deemed reasonable when the case plan has identified the problems leading to the loss of custody, the agency has offered services designed to remedy those problems, has maintained reasonable contact with the parent, and has made reasonable efforts to assist the parent in areas in which compliance has proven to be difficult. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) The standard is not whether the agency could

8

have provided better services in an ideal world, but whether the services were reasonable under the circumstances. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Here, father does not identify the nature of the services the Agency allegedly failed to provide. Rather, father asserts his case plan was modified in January 2014 following Dr. Cornejo's neuropsychological evaluation. He further asserts that because Dr. Cornejo suggested "some of these services would require a year to complete" and the Agency "included these time estimates in the proposed plan that the court ordered," the court therefore was obliged to extend services for "the anticipated twelve months to complete the new requirements."

Father's characterization of the record on this point is not persuasive. First, even if father's case plan was modified in January 2014, that did not "restart" the reunification period, which is strictly governed by statute. (See §§ 361.5, subd. (a)(1)(A), 366.21, subd. (g) [reunification services shall be provided for 12 months and may be extended until 18 months from date of minor's detention only if the court finds (1) services provided were unreasonable or (2) there is a substantial probability of the child being returned to parents' custody by the 18-month date].) Second, the "modified" case plan did not differ greatly from the original case plan developed by the Agency in its disposition report of April 2013. Indeed, most of the elements of the original plan are identical to those specified in the "modified" plan; for example, "[t]hat the father participate in individual psychotherapy that addresses issues that impact his parenting including communication patterns with the minor," and "[t]hat the father demonstrate an ability to respond to the minor's developmental and emotional needs in therapeutic visitation." In other respects, the "modified" plan merely fine-tunes elements already included in the original plan; e.g., the original plan specifies that "father participate in a father's group that addresses socialization and parenting issues," whereas the "modified" plan states, "[t]hat the father complete a parenting education class" and notes Dr. Cornejo

9

recommended a group for "single fathers in order to decrease [father's] feelings that he is alone and unsupported in his job as a parent." Also, the original plan specified "[t]hat the father complete a drug treatment program which includes counseling and testing;" the "modified" plan specified the drug treatment be in a residential program. In fact, the *only* services that Dr. Cornejo recommended on a year-long basis were life-skills counseling and drug testing upon completion of a residential drug program. In sum, father's contention that the minor modifications to his case plan in January 2014 mandated an automatic extension of services, and thus rendered the services provided unreasonable, is without merit.

However, father recasts the above argument in evidentiary terms, contending the trial court's "failure to admit evidence of the modification of the prior six-month reunification plan in determining whether father received reasonable services was prejudicial error." The evidence in question was a January 22, 2014 transfer summary report[3] proffered by father's counsel at the contested hearing in July 2014 to support the claim that the court ordered new reunification requirements in January 2014 that should have lasted one year.

This evidentiary contention is also without merit. First, father offers no authority for the proposition that when a case plan is modified, the court is obliged to extend the period of reunification services beyond the time limits provided by statute. Moreover, on the record before us, any evidentiary error was harmless. As noted above, the only services that Dr. Cornejo recommended on a year-long basis were life-skills counseling and drug testing upon completion of a residential drug program. But it was not father's lack of participation in life-skills training or drug testing that led the trial court to

---

[3] A transfer summary is a summary of the case prepared by an outgoing social worker and made part of the case file for the benefit of the incoming social worker newly assigned to the case. The transfer summary showed services recommended for father were modified in January 2014.

10

terminate reunification services.[4]  Rather, the court terminated services based on father's limited improvement in therapeutic visitation and his failure to begin individual therapy and mental health treatment—services which were ordered in the *original* reunification plan in April 2013.  In short, extraordinary relief based on the trial court's evidentiary ruling is entirely unwarranted.

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  (See Cal. Const., art. VI, § 14; *Kowis v. Howard* (1992) 3 Cal.4th 888, 894.)  The decision is final in this court immediately.  (See Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[4]  However, we note that at the six-month review stage in October 2013, father had not yet started drug treatment or drug testing and had not started attending a father's group.

11

_____

Dondero, J.

We concur:

_____

Margulies, Acting P.J.

_____

Banke, J.