Filed 6/26/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Sofia M., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>S. M.,<br><br>    Defendant and Appellant. | G055752<br><br>(Super. Ct. No. 16DP0465)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

\*          \*          \*

We have encountered this narrative before. Mother makes no progress on her case plan for a whole year, then, when it finally sinks in that she is going to lose her parental rights, she begins eagerly complying with the plan. The twist in this case is that the child, Sofia, was 14 years old, and by the time mother decided to comply with the plan, Sofia was depressed and too hurt to want to spend any time with her. So she refused visits. At the 12-month review hearing, mother complained that she had been prevented from visiting Sofia. The court left the visitation order in place, and even authorized visitation in a therapeutic setting, but terminated reunification services and set a selection and implementation hearing under Welfare and Institutions Code section 366.26 (.26 hearing).[1] Sofia continued refusing visits and threatened to run away from therapy sessions if she were pressured.

At the .26 hearing mother filed a section 388 modification petition, seeking to reinstate services, arguing she had been denied the ability to establish the "beneficial relationship exception" to adoption. The court denied the petition, terminated parental rights, and selected adoption as a permanent plan.

On appeal, mother contends Sofia's refusal to visit amounted to a failure by the court to enforce its order. We disagree. The court's visitation order was appropriate, and it granted every visitation accommodation mother requested. The fact that no one was able to persuade Sofia to visit her mother does not amount to an error by the court. Accordingly, we affirm.

---

[1] All statutory references are to the Welfare and Institutions Code.

2

FACTS

In March 2016, the Orange County Sherriff's Department conducted a welfare check on Sofia and her 6 siblings and half-siblings.[2] The children were at the home of their maternal grandmother, who reported that mother had a pattern of leaving the children at the homes of relatives without adequate supplies or a plan for medical care. The adult relatives present, as well as the verbal children, reported that mother had a substance abuse problem. Sofia's father had made no effort to provide for her.

In April 2016, a social worker interviewed the maternal grandmother, who reported that mother was abusing drugs, had not been providing care for the children, and had a history of leaving the children at her house. Since December 2015, mother had left the children in the care of the maternal grandmother and aunt three to four days each week without checking in on them. She reported that the children were behind on medical appointments due to mother's neglect and her refusal to grant the maternal grandmother legal authority to make medical decisions for the children. She reported that mother was homeless. The maternal grandmother and aunt, due to their concern for the children, alerted law enforcement.

That same day, the social worker interviewed Sofia, who, at that point, was 14 years old. She reported that mother does not take care of her or her siblings, nor provide food. She reported mother "yells at [her] accusing her of taking [mother's] belongings from her purse with 'angry eyes.'" Sofia described mother "as a 'mess,'" noting mother "'looks tired,' and specified the mother 'acts different' and 'throws a book at her,' accusing her of taking the mother's belongings or hiding the keys." Sofia reported she feels safe with the maternal grandmother, but not with mother.

---

[2] This appeal concerns only Sofia.

On May 2, 2016, SSA filed a dependency petition on the children's behalf, alleging they came within the juvenile court's jurisdiction pursuant to sections 300, subdivisions (b) (failure to protect) and (g) (failure to provide). The court ordered Sofia detained, ordered reunification services, and authorized mother to visit eight hours per week.

The social worker managed to make phone contact with mother one week later. Mother admitted to having used methamphetamine three days before and confirmed she was homeless. The social worker noted mother was yawning and slurring her speech throughout the call.

Between then and June 14, 2016, the date of the jurisdiction/disposition hearing, mother broke off all contact with the social worker. Mother had taken two drug tests in the interim, both of which were positive. She missed her remaining eight drug tests.

The court found the allegations in the petition to be true. It ordered reunification services, including parenting classes, therapy, random drug testing, an outpatient drug program, and a 12-step program. The court maintained its visitation order.

Over the next six months, mother made no progress on her plan and, other than an initial monitored visit, did not visit Sofia. Mother was referred to counseling, parenting classes, drug treatment programs, and drug testing. She did none of it. At the six-month review hearing, the court found mother had made no progress on her case plan, but, nonetheless, ordered another six months of services.

In anticipation of the 12-month review hearing, the social worker reported mother attended an "initial" monitored visit on March 30, 2017. Mother was not present when the visit was scheduled to begin. As the minutes ticked by, Sofia began crying. When mother finally arrived, however, she was happy. Mother was loving towards Sofia during the visit, and it seemed to go well. The social worker scheduled further monitored

4

visits and reminded mother that she only had a 20-minute grace period to arrive at a scheduled visit.

Thereafter, mother failed to visit regularly. Sofia reported that when mother had visited "she has talked to her about the case and has told her that the reason she is visiting is because she does not want her and the [siblings] adopted by the aunts." She further reported that, when mother had visited, she only stayed for about one hour of the four hour scheduled visit and seemed anxious to leave. Sofia indicated "she no longer wants to visit with the mother, as she does not feel that her mother is committed to her." Nonetheless, both the social worker and caregiver continued to encourage Sofia to attend visits.

On May 2, 2017, the social worker spoke with Sofia's therapist. The therapist reported that Sofia had "been very sad recently, and that visits with her mother ha[d] really affected her." The therapist also reported that "the child obsesses, at times, about why her life cannot go back to normal and have her mother be well so she can live with her and all her siblings. She also reported that the child is very let down by her parents."

On May 8, 2017, mother began drug testing and immediately tested positive for methamphetamine. She tested again on May 15, this time negative.

On May 19, 2017, the social worker reported in anticipation of a May 31 12-month review hearing. Mother had made no progress on her case plan. Sofia's caretakers had expressed interest in adopting her, and Sofia likewise wanted to be adopted by the aunts. The recommendation was to terminate reunification services and schedule a .26 hearing.

In late May and early June, mother finally began attempting to comply with her case plan. She began Narcotics Anonymous meetings on May 31, 2017, a parenting class on June 3, 2017, and a Perinatal program on June 12, 2017. As of June 2017, Sofia was continuing to refuse visitation with mother.

5

As of mid-July 2017, mother was continuing to attend Perinatal classes, though she was only attending the process groups and not the education groups, both of which are necessary to advance in the program. Nonetheless, the therapist assigned to mother reported that she "appears energetic about the program." Mother submitted to several drug tests between June and July, most of which were negative. However, her drug patch, which was applied June 19 and removed June 26, tested positive for Methamphetamine, and she missed a drug test on June 29, 2017. Mother had completed a parenting program, where it was reported she actively participated. She had not furnished proof of participation in 12-step meetings. Regarding counseling, she had completed her intake appointment but had not yet begun counseling, which the social worker anticipated her starting the following week.

Sofia was continuing to refuse visitation with mother. The social worker reported, "The undersigned has motivated the child to attend her visits, but the child has reported that she 'is not ready.' The child stated that her parents do not care about her and have not made efforts to gain her custody. The undersigned reported to the child that visits are Court ordered. The undersigned reported to the child that a visit would be set up with both parents. The child stated, 'You can set them up, but I'm not going.' On June 27, 2017, it was agreed that visits for the mother would be set up on Thursdays at 5:00 pm at a local park. The mother is to call the caregiver every Thursday to inquire if the child will be attending. The mother has reported that she has called, but so far, the child has refused to attend visits."

At the contested 12-month review hearing in July 2017, the court terminated reunification services. The court set a .26 hearing for November 15, 2017. Mother's counsel addressed the court concerning visitation with Sofia, stating, "Mother has informed me that she hasn't seen her in about three months. Mother's sensitive to the reasons why Sofia may not want to attend the visits. Mother understands that. Nevertheless, mother is requesting visitation. She has suggested that, perhaps, conjoint

6

counseling would be a good way to start that process." The court asked mother's counsel what her specific request was, and counsel responded, "[S]he's asking for the visits outlined in the May 31st [order]." The court granted that request, stating, "The court is . . . adopting the recommendation, two times per week. And, again, the court also authorizes written expression of sentiments and that . . . efforts . . . be made to accommodate mother's visitation inside a therapeutic setting to the extent that can take place." The court then inquired if there were any other requests, and mother's counsel said, "No."

In September 2017, mother, with the help of her therapist, completed a letter to Sofia. Sofia refused to read it. In November 2017 Sofia reported that she saw her aunts as her "real family" and wanted to be adopted by them.

At the outset of the .26 hearing on December 1, 2017, mother filed a modification petition pursuant to section 388, asking the court to vacate the .26 hearing and reinstate reunification services, citing *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter*). At the hearing, mother's counsel argued the court's visitation orders had not been enforced, and thus mother had been deprived of the opportunity to establish the exception to adoptability of a beneficial relationship pursuant to section 366.26, subdivision (c)(1)(B)(i). Sofia's counsel asked the court to deny the petition, stating, "[M]y client is 15 years old. You don't drag a child to a visit or force visitation on someone and expect that's going to somehow remedy the relationship. [¶] This relationship broke down long before the petition was filed in this particular case. I don't believe that there's any showing that the child could be returned today without both physical or emotional detriment occurring." The court denied the petition. It distinguished the *Hunter* case, stating, "There were outstanding visitation orders and those orders do not provide . . . that visits would take place if agreed to by [Sofia]. They were ordered."

7

The court then proceeded to the .26 hearing. At the outset, mother's counsel moved to vacate the hearing based on the same arguments. The court denied the request.

Mother testified at the .26 hearing and acknowledged that her sister, the caretaker, "does her part as [a] caretaker by asking her and giving her the messages that I tell her . . . to provide to her. You know, it's just that [Sofia] is blocking herself from me at this point because she is hurt . . . ."

Sofia also testified. When asked why she wanted to be adopted, she responded, "Because my aunts have always been there for me when my mom wasn't. They have always taken care of me. So I actually want to be with a real family and not with . . . ." At this point in her testimony, Sofia was crying and the inquiry moved to other subjects. Sofia later returned to the initial inquiry, stating, "my mom was never my mom. I've taken care of myself since I was ten. I've taken care of my brothers. When my other brother . . . was born, I've always taken care of him. I felt independent. My mom has never been there for me. My aunts have been there for me. So I feel they should be my mom." The court found Sofia was specifically adoptable and terminated mother's parental rights. Mother appealed from that order.

DISCUSSION

On appeal, mother repeats her argument that the court failed to enforce its visitation order. "In matters relating to child custody and visitation rights, the trial court is vested with a wide discretion and its determination will not be disturbed in the absence of a manifest showing of abuse." (*In re Marriage of Murga* (1980) 103 Cal.Appl3d 498, 504.)

Section 362.1, subdivision (a), provides, "In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when,

8

to return a child to the custody of his or her parent or guardian, . . . any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] (1)(A) Subject to paragraph (B), for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." Subdivision (a)(1)(B) provides, "No visitation order shall jeopardize the safety of the child."

There is no dispute that the court's visitation order complied with this statute. Mother's contention is that the court failed to enforce its order, a contention based on *Hunter, supra,* 142 Cal.App.4th 1497.

*Hunter* was an appeal from an order terminating parental rights and denying a section 388 petition. There, the 5-year old minor was detained and placed with a grandmother while the mother was incarcerated. (*Hunter*, *supra*, 142 Cal.App.4th at pp. 1500-1501.) The mother kept contact with the minor via monthly letters. (*Id.* at p. 1501.) When the mother was released over a year and a half later, she entered a rehabilitation center where she attempted to maintain contact with the minor via phone. The minor spoke with her a few times, but began refusing to accept her calls and stopped writing letters back to her. (*Ibid.*) The minor told his therapist he did not miss his parents and felt safe and comfortable with his grandmother. (*Ibid.*) He was tired of his mother lying to him and afraid he would be exposed to more neglect if returned to her. The court ordered visitation "'as can be arranged'" through mother's rehabilitation center program. (*Ibid.*) The minor, however, continued refusing visits, despite efforts by the social worker, his relatives, and his therapist to get him to do so. (*Ibid.*)

At the .26 hearing, now almost two years after the start of his case, the minor was adamant that he did not want to live with his mother. (*Hunter*, *supra*, 142 Cal.App.4th at p. 1501.) Meanwhile, mother was sober and employed and continuing to attempt to visit the minor, to no avail. (*Id.* at p. 1502.) The minor received extensive therapy, but he mostly refused to talk about his mother, and grew uncharacteristically

9

angry when the therapist pressed the issue. (*Ibid.*) The grandmother caretaker was appointed as the minor's legal guardian. (*Id.* at p. 1501.)

In the post-permanency planning stage, the minor continued refusing visits. Mother asked the court to permit visits in a therapeutic setting. (*Hunter*, *supra*, 142 Cal.App.4th at p. 1502.) The court ordered the social worker to "discuss the matter with [the minor's] therapist in an attempt to move the issue forward at an appropriate pace, so joint counseling could take place." (*Ibid.*) At a subsequent .26 hearing, after both the minor and caregiver agreed to adoption, the court refused the mother's renewed request to change the court's order to enable her to get joint therapy with her son. (*Id.* at p. 1503.) Subsequently, one visit occurred, "the reports of which were decidedly mixed." (*Ibid.*) Afterwards, mother filed a section 388 petition, seeking changes to the visitation order, but the court denied the petition and terminated parental rights. (*Hunter*, at pp. 1503-1504.)

The Court of Appeal found the trial court erred in ordering visitation "as can be arranged." (*Hunter*, 142 Cal.App.4th at p. 1505.) "While the court granted visitation in theory, none was permitted in reality. This situation was, to some extent, the consequence of decisions made by [the minor's] therapists to give the child time to come to terms with his negative feelings about [mother]. In the end, however, [the minor] himself was given virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, [social services] or any third person, unlimited discretion to determine whether visitation is to occur." (*Ibid.*; see *In re S.H.* (2003) 111 Cal.App.4th 310 [error to order visitation subject to the condition, "if the children refuse a visit, then they shall not be forced to have a visit"]; *In re Julie M.* (1999) 69 Cal.App.4th 41, 43-44 [abuse of discretion to order visitation subject to obtaining children's consent prior to each visit]; *In*

10

*re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1475 [error to order "'[f]ather to have no visitation rights [with children] without permission of minors' therapists'"].)

Up to this point, we agree with *Hunter*, but find it distinguishable. The court here did not order visitation "as can be arranged," or in any other manner that created uncertainty about whether mother was, in fact, legally entitled to visitation. The court simply ordered visitation, twice a week, for four hours at a time. The court's order was proper.

The *Hunter* opinion went on to discuss the court's error in terms of a failure to *enforce* the order: "The visitation order was never enforced simply because [the minor] continued to refuse any contact with his mother. This failure to enforce the order was error." (*Hunter, supra,* 142 Cal.App.4th at p. 1505.) This language risks conflating two distinct issues: the propriety of the order, and its enforcement. Further, it suggests that the *court* errs when the *child* refuses a proper visitation order. To the extent *Hunter* stands for those propositions, we disagree. The court does not err by failing to do that which it is not requested to do.

When a child refuses visitation, it is the parent's burden to request a specific type of enforcement, or a specific change to the visitation order. Absent a request, it is not the court's burden to sua sponte come up with a solution to the intractable problem of a child's steadfast refusal to visit a parent. Trial judges are not mental health experts, nor child behavior experts. As one court noted, "[D]ependency courts 'simply do not have the time and resources to constantly fine tune an order in response to the progress or lack thereof in the visitation arrangement, or in reaction to physical or psychological conduct which may threaten the child's well-being.'" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 51.) Those sorts of changes are better handled, in the first instance, through communication with SSA, and, as needed, through motions to modify the visitation order. It is the parent's burden to initiate those procedures, not the court's.

11

In the present case, the only enforcement mechanism mother requested was a visit in a therapeutic setting, which the court expressly permitted. The court also permitted mother to write letters to Sofia. Those were reasonable efforts.

However, it was not the court's duty to ensure those particular efforts were ultimately effective in overcoming Sofia's opposition to visitation. The reality in many of these cases is that the parent has irreparably damaged the relationship beyond salvage. This cannot be presumed, of course, and thus courts must, consistent with the child's wellbeing, order visitation and enforce that order appropriately. But if it turns out, after reasonable efforts have been exhausted, the child simply cannot be persuaded to visit, that, in and of itself, is not a basis for reversal.

## DISPOSITION

The postjudgment order is affirmed.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

ARONSON, J.

12