Filed 6/21/24  In re G.V. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re G.V., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E082540 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2300200) |
| v. | OPINION |
| G.V., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

1

K.G. (Mother) is the mother of Child 1 (male, born December 2007), Child 2 (female, born August 2009) (collectively, older children), and Child 3 (male, born November 2016).[1] G.V. (Father) is the father of Child 3. The father of the older children is deceased. Father appeals from the juvenile court's order removing Child 3 from Father's custody. For the reasons set forth *post*, we affirm the trial court's findings and orders.

FACTUAL AND PROCEDURAL HISTORY

On June 9, 2023, the Riverside County Department of Public Social Services (the Department) filed a Welfare and Institutions Code[2] section 300 petition on behalf of the older children and Child 3. On the same day, the Department filed a detention report.

In the detention report, the Department noted that on June 5, 2023, it had received an immediate response referral. "It indicated that on June 04, 2023, MGF contacted law enforcement after MGF and [M]other were involved in an altercation."[3] During this time, the older children lived with the NREFM, Richard L. and his wife Barbara D. After Mother visited with Child 2, Mother took Child 2 back to Richard L.'s home. Mother then returned to the house because she believed that Child 2 had stolen Mother's

---

[1]     Mother and the older children are not parties to this appeal.

[2]     All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3]     As will be discussed below, although the Department initially believed the referral was from maternal grandfather (MGF), the report was made by an nonrelated extended family member (NREFM), Richard L.

2

marijuana. When Richard L. went outside, Mother "punched him in the face and the jaw. [Richard L.] lost consciousness. [Child 2] was behind [Richard L.] and when he lost consciousness, [M]other then attacked [Child 2]. Mother punched and scratched [Child 2] in the face and then punched her in the chest, knocking the wind out of her. [Richard L.] regained consciousness and called 911. When [M]other saw [Richard L.] calling law enforcement, she left the home."

On June 6, 2023, a social worker responded to the referral address and spoke with Barbara D. When the social worker asked to speak with the MGF, Barbara D. told the social worker that MGF was deceased. Barbara D. stated that the older children have lived with Barbara D. and Richard L. for five years. MGF was granted custody of the children in 2010. However, when MGF died in 2019, Mother agreed to leave the older children in Barbara D. and Richard L.'s care because Mother struggled with mental illness, domestic violence and methamphetamine abuse. Mother also asked Barbara D. to care for Child 3; Barbara D. declined because she could not afford to support a third child.

Richard L. told the social worker that Mother was angry that Child 2 stole marijuana from Mother's home. When Mother returned to the house, Child 2 went outside to give the marijuana back to Mother. Mother hit Child 2 twice. When Richard L. attempted to push Mother away, Mother attacked him. Richard L. reported that Child 3 was in Mother's car during the altercation. When Mother got to her car, she

3

shouted, "'I will blow your car up, and I will get this handled.'" Richard L. believed Child 3 heard the altercation and Mother's statements because of all the commotion.

The detention report then detailed the older children's statements to the social worker confirming the events that occurred on June 5, 2023, and summarizing the domestic violence between Mother and Father.

The Department unsuccessfully tried contacting Mother and Father. After the social worker visited Father's last known address on June 6, 2023, and left a voice mail on Father's phone number, paternal uncle Paul V. contacted the social worker; he retrieved the social worker's business card from Father's front door. Paul V. agreed to forward the information to Father.

On June 7, 2023, the social worker spoke with Father. Father stated that he was recently awarded full custody of Child 3. Father stated that "[h]e had been attempting to get his son back from the [M]other, but she had placed a temporary restraining order against him." The social worker told Father that she would call him back and needed to interview him.

On the same day, June 7, 2023, the Department obtained a warrant to remove Child 3 from Mother and Father (collectively, Parents). Two social workers went to the maternal grandmother's (MGM) home; MGM was evasive about the whereabouts of Mother and the children. Eventually, MGM called Mother and informed her that social workers were there to pick up the children. When one of the social workers told Mother that they had a detention warrant for the children, Mother refused to disclose her location.

4

The social worker encouraged Mother to surrender the children at a nearby Department office prior to the court date.

On June 8, 2023, the social worker interviewed Father. He claimed that he and Mother broke up in 2019. Father reported that in 2017, Mother became violent after relapsing on methamphetamine. Mother would slap, kick, and punch him. The children witnessed Mother attacking him. Father admitted going to prison in 2019 after a domestic violence incident; Mother, however, was the aggressor. Nonetheless, Father was convicted of violating a restraining order, and not domestic violence, and spent two and a half years in prison. Father claimed that once he was released, he did not want to resume a relationship with Mother, but she demanded that they get back together. Moreover, Father stated that "[M]other would not allow him to take [Child 3] for visits overnight, and [Father] could only see [Child 3] at [Mother's] home."

Father then told the social worker that he "went to court to obtain custody of [Child 3], because [Father] found evidence of the [M]other smoking methamphetamine and having paraphernalia in her home." Mother did not appear in court. The court awarded Father full custody with no visitation for Mother "until she completed a batterer's intervention program[.]" Mother was upset about the order. When Father went to visit Child 3, Mother slapped Father and asked why Father "was doing things behind her back." Father left because he did not want "to have an incident that would cause the police to come."

5

The next day, Father picked up Child 3 from school. When Father and Child 3 went to Mother's home to retrieve Child 3's clothes and toys, Mother refused to let Father leave with Child 3. Father stated that law enforcement refused to help him. Father later learned that Mother had filed a new restraining order against Father.

In the detention report, the Department listed prior investigations by the Department.[4]

In June of 2017, a referral stated that Child 3, then seven months old, had bruises and a bump on his forehead. Mother stated that the bump was a mosquito bite. It was reported that Mother, who was frustrated, "yanked [Child 3's] arms down and shoved a bottle in his mouth (like she was saying 'shut up')." Moreover, Mother did "not want to care for [Child 3] on the weekends; [M]other has her two older children during the school [week] and they are with the 'foster parents' on the weekends; during summer, the children are with 'foster parents' during the week and are with [M]other on the weekends." The referral also stated that Mother obtained a restraining order and forced Father to leave the home. The referral was closed as "[u]nfounded," because the older children denied domestic violence between the Parents, and voiced no fear of Father. The Department noted that although "there was no domestic violence at this time," the family's situation "could escalate in the future if not addressed with services."

---

[4]     Because this appeal only involves Father and Child 3, only the referrals involving Child 3 or Father will be discussed.

In December of 2017, a referral alleged that Father had bloodied Mother's nose, possibly breaking it, by punching her in the face. Child 3 was home but not present for the altercation. Law enforcement arrested Father and provided Mother with an emergency protective order. During the Department's investigation, Mother denied physically fighting with Father. The older children also denied seeing domestic violence; they did not live in the home. Father was released on bail. The referral was closed as inconclusive.

In January of 2018, a referral alleged that Mother and Father argued and yelled at each other constantly; Mother drove off in her car before the children were secured in the car; and law enforcement and medical personnel had visited the home on multiple occasions. The Department closed the referral as "[u]nfounded" because the older children appeared happy and healthy, and there were no identified safety hazards in the home.

In May of 2018, a referral indicated that Mother and Father engaged in "ongoing arguing," and Mother had untreated mental health issues. During the investigation, Mother denied domestic violence. The Department, however, learned that Father had been in jail after a domestic violence incident. Mother admitted Father had been arrested and a protective order was filed. Mother planned "to testify the information is not true and attempt to have the restraining order lifted." Mother denied that Child 3 was present for the incident. Child 3 was too young to be interviewed. The referral was therefore closed as "[u]nfounded."

In August of 2018, Father violated a restraining order and punched Mother in the face while she held Child 3. Mother claimed that Father came to her home uninvited; Father claimed he lived with Mother. The Department determined that both Parents were violating the restraining order by having continued contact. Father denied punching Mother; the older children were not home. The referral closed as "[i]nconclusive."

On September 7, 2018, Mother obtained a permanent restraining order, set to expire in November 2023, against Father in family court. In September 2020, the court terminated the order pursuant to Mother's request.

In January of 2019, a referral alleged that Mother was abusing methamphetamine, and had threatened to kill Child 3, then age two, via text message. During the investigation, Mother claimed that Father stole her phone and sent the text message threatening Child 3 to himself. The referral was closed as "[u]nfounded."

In April of 2021, a referral alleged that Mother physically abused Child 3 by shoving him into a car while "cussing and swearing." The Department could not contact Mother, the older children, or the older children's caregivers. The referral was closed as "[i]nconclusive."

In September of 2021, Mother and Father individually requested restraining orders against each other. A temporary order expiring in January 2022 was issued to Mother. A permanent restraining order expiring in January 2025 was issued to Father. The restraining order against Mother did not allow contact between the parties, other than peaceful written contact through a lawyer or process server.

In December of 2021, a referral alleged that Father was recently released from prison for a domestic violence incident with Mother. Father was not allowed to contact Mother, but Mother would not allow Father to see Child 3 unless she was present. Mother had untreated mental health issues and texted paternal grandmother (PGM) a message threatening to harm the children. The Department closed the referral as inconclusive because it was unable to contact the family. The Department, however, contacted Fresno County Child Protective Services based on a tip that Mother may have relocated to Fresno. The Department also verified that the threatening text message had been sent several years earlier in 2018.

On April 4, 2022, the permanent restraining order protecting Father was set aside; it was ultimately terminated. On April 25, 2022, Father obtained a new permanent restraining order that expires in April 2025. Pursuant to the order, Mother is to stay at least 100 yards away from Father, his home, his workplace, and his vehicle. Mother is not permitted to contact Father, other than to have brief and peaceful communications about Child 3 for court-ordered visits.

In March of 2023, a referral alleged that Mother told Child 3's school staff that Father was keeping Mother hostage. The next day, Child 3 did not attend school. Mother claimed if she took Child 3 to school and Father found out, "he would call law enforcement, report [Child 3] as kidnapped and have [Mother] arrested." The Department concluded, "No safety factors identified."

9

On June 9, 2023, the Department filed the dependency petition alleging that the older children and Child 3 came under section 300.

At the detention hearing on June 12, 2023, Father, PGM, and two paternal aunts appeared. Mother and the children were not present. The court recalled and quashed the protective custody warrants issued for the children on June 7, and issued new warrants on June 12. The court also issued a bench warrant for Mother. The court ordered Father to participate in supervised visits twice a week for Child 3.

On June 28, 2023, the Department filed its jurisdiction and disposition report. The social worker reported that she interviewed Father; he confirmed that he witnessed Mother physically abuse Child 2 by slapping her, throwing her against the wall, and grabbing Child 2's hair. Father also reported that he saw Mother "back hand" Child 2. Father told the social worker that Mother became violent with him two years into their relationship when she began to use methamphetamine.

On June 30, 2023, Mother filed a request for domestic violence restraining order. Mother asked the court to restrain Father and protect her, Child 3, the older children, and Mother's adult son. Mother alleged that Father threatened to harm Mother and her children physically, and Father made "a very [graphic] threat about hurting [Mother's adult] son and said it would be a bloody mess." Mother also accused Father of stalking her and claimed that he "tracked, controlled" and "blocked" her movements. Mother stated that she reported Father to the Corona Police Department and the Riverside District Attorney's Office. Mother alleged that in February 2023, Father threatened that she

"[won't] be around soon" and that Mother should "prepare Child 3 for that day." Mother claimed that Father used "spoof numbers so he [isn't] trackable."

In describing Father's abuse, Mother claimed that she lived "in fear daily of what [Father] may do to get revenge[.]" She stated that although they "had been relocated by the [R]iverside [D]istrict [A]ttorneys [O]ffice," Father "was still able to locate [them]." Mother alleged that Father obtained a family court order, without her knowledge, awarding Father sole custody of Child 3.

Mother requested that Child 3 be protected from Father, and Father not have access to Child 3's medical or educational information. Mother requested sole physical and legal custody of Child 3.

On July 3, 2023, the juvenile court continued the jurisdiction/disposition hearing because Mother and the children had not been located.

On August 16, 2023, the Department filed an addendum report. In the report, the Department stated that on July 27, the District Attorney's abduction team located Mother and the children at Mother's home. The children were placed with the NREFM, Barbara D. and Richard L. However, "[o]n July 28, 2023, the children absconded from [Richard L.] and [Barbara D.] between the hours of 2 AM and 7 AM." On that day, law enforcement pulled over Mother and children. Mother "was arrested and the children were taken into protective custody." Two days later, Child 3 "was placed at a confidential location."

11

The Department reported that on August 2, 2023, the two older children absconded from the Department's office.  Moreover, Mother "was bailed out."

On August 8, 2023, Mother provided the social worker with a copy of the temporary restraining order she filed against Father.  The day after, the Department cancelled supervised visits between Father and Child 3 because the restraining order did not allow contact between the two of them.  On the same day, Child 3 and Mother had their first supervised visit.  During the visit, Mother absconded with Child 3.  Law enforcement located Mother with all three children.  On August 11, all three children were taken into protective custody.

On August 17, 2023, the juvenile court temporarily suspended visits between Mother and the children.  The court set a jurisdiction hearing date for September 5.  Father's counsel informed the court that Father contended "that [M]other has been downloading applications on her phone which portray [Father] as sending and receiving messages between the two of them."  Counsel went on to state, "I want to make it clear that [Father] intends [*sic*] that none of this is happening."

On August 31, 2023, the Department filed its addendum report. In the report, the Department provided that Mother filed another request for a restraining order against Father on July 28.  In her request, Mother alleged that Father was wanted for felony stalking.  Father had entered her home unlawfully, threatened to hurt Mother and the children, and evaded service for a previous temporary order.  Mother repeated Father's threats that she would not be around soon and that he used spoof numbers to go

undetected. The court granted Mother's request, with an expiration date of August 18. The order did not allow Father to contact the Mother or the children.

On September 5, 2023, the Department filed a first amended petition to supersede the original petition. The petition added count b-5, alleging that the parents engaged in domestic violence in front of Child 3.

On September 8, 2023, the juvenile court authorized Child 3 to have audio and video visits with Mother and his siblings. In-person visitations remained suspended. Although Father asked for liberalized visits, including overnight visits, Child 3's counsel objected. Counsel asked the court to wait until the Department conducted interviews with Mother and the children. The court authorized Father to have increased visits, but withdrew the authorization for the Department to place Child 3 with Father.

On September 27, 2023, the Department filed another addendum report. In the report, the social worker provided that Mother continued accusing Father of harassing and stalking her. Mother also provided screenshots of inappropriate and threatening text messages from Father.

The social worker reported that on September 18, 2023, Richard L. informed the Department that Child 2 arrived at his home unexpectedly. Child 2 told Richard L. that she ran away from her foster home and had been staying on the street. The next day, the social worker went to the home of Richard L. and Barbara D. and found Child 1 to be there too. Richard L. stated that Child 1 "had just shown up."

When the social worker spoke with Child 2, she stated she had been with Mother and MGM but wanted to return to Richard L.'s home. According to Child 2, Child 3 should return to Mother's care because Child 2 was "worried about [Child 3] being in the care of his [F]ather," who was "not a good person."

Child 1 told the social worker that Father threatened Child 1's family after Father was released from prison. According to Child 1, Father threatened Child 1 in the past, and that Father had sent Child 1 threatening messages.

On September 21, 2023, Child 3 reportedly stated that "it will be better for everybody if my dad was dead." On September 26, Child 3's caregiver stated that although Child 3 was "open to seeing his [F]ather," he did not want to be alone with Father.

On October 3, 2023, the Department filed a second amended petition, and on October 11, a third amended petition. The amendments addressed allegations related to Mother. The sole allegation against Father was unchanged.

On October 11, 2023, Father filed a JV-190 Waiver of Rights wherein he waived his right to a trial. Father submitted on the petition on the basis of the social worker's report and other documents. By signing the document, Father verified that he understood that if he submitted on the petition, the court would likely find the petition true.

At the contested jurisdiction/disposition hearing on October 11, 2023, Father requested liberalized visits with Child 3. Father's counsel stated: "We are hoping at the next hearing—hopefully at the next review hearing that the child can be returned to his

14

[F]ather. Father wants Child 3 with him." Father stated that if he gained custody, Mother would be permitted to visit Child 3. Mother's counsel argued that Father's request was unreasonable because he needed to complete his case plan before he should be allowed to have unsupervised contact with Child 3.

The juvenile court sustained the allegations in the petition and declared the children dependents. The court noted that it had removed Child 3 from Parents and ordered them to participate in reunification services. The court found that neither Parent made any progress toward alleviating or mitigating the causes necessitating placement. The court stated that it "would be inclined to authorize liberalization [of visits] for both [P]arents." The court then adopted and approved the case plan, which included twice a week monitored visits for Father with Child 3.

Father filed a timely notice of appeal.

## DISCUSSION

On appeal, Father contends that "there was insufficient evidence to support the order removing [Child 3] from his custody and requiring monitored visitation." We reject Father's arguments.

*A. Removal Order*

We first address the Department's argument that Father has forfeited his arguments on appeal. If a parent fails to object or raise an issue in juvenile court, the parent has forfeited this issue on appeal. (*In re Urayna L.*(1999) 75 Cal.App.4th 883, 885; *In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [it is a fundamental rule of appellate

15

law that a party is precluded from arguing on appeal any point not raised in the trial court].)

In this case, at the contested jurisdiction/disposition hearing on October 11, 2023, Father submitted to jurisdiction in count B-5 that he engaged in domestic violence with Mother. As provided above, Father filed a JV-190 Waiver of Rights. His counsel also stated, "[w]e did submit a JV-190 with the Court yesterday. We did go over trial rights, waiver of those rights, and the consequences of that waiver. [¶] We will be waiving those rights and submitting to the third amended petition." Moreover, when the juvenile court ordered removal of Child 3 from Father, neither Father nor his counsel objected. Instead, Father's counsel simply asked "for liberalizing visitation with [Father] and [Child 3], up to placement."

Because Father failed to raise the issue of removal below, Father has forfeited the right to challenge the court's order removing Child 3 from Father's care.

Assuming *arguendo* Father has not forfeited his argument, we next address whether substantial evidence supports the court's order removing Child 3 from Father's care.

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] (1) [That] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable

16

means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . custody." (§ 361, subd. (c).)

"Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Kiesha E.* (1993) 6 Cal.4th 68, 76.) California law therefore "requires that there be no lesser alternative before a child may be removed from the home of his or her parent." (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 284; § 361, subd. (c)(1).) However, "'"[t]he *parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.*" [Citation.] The court may consider a parent's past conduct as well as present circumstances.'" (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126, italics added.)

We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, "'bearing in mind the heightened burden of proof.'" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146.) In *Conservatorship of O.B.* (2020) 9 Cal.5th 989, the California Supreme has stated that "appellate review of the sufficiency of the evidence in support of a finding requiring clear and convincing proof must account for the level of confidence this standard demands. … [W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true.

17

Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 995-996.)

In this case, the court made the following dispositional orders: "With regard to [Child 2] and [Child 3], there's clear and convincing evidence of the circumstances stated in [section] 361 regarding [Mother] and regarding [Father]." "[P]hysical custody of [Child 3] is removed from [Father]."

On appeal, Father contends that "[t]he court's cursory order does not show that there were any factual findings made to support the order of removal." In support of his argument, Father contends that "[t]he juvenile court was 'statutorily required to determine whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home and shall state the facts on which the decision to remove the minor is based.' (*In re L.O.* (2021) 67 Cal.App.5th 227, 246-247, quoting § 361, subd. (e).)"

Here, at the contested hearing, the court stated:

"[S]o the Court has reviewed, considered, and will admit into evidence the detention report dated June 9th, 2023; the jurisdiction report dated June 28th, 2023; the addendum report dated 8/16/2023; the further addendum dated 8/31/2023; and the most recent addendum dated September 27th, 2023." The court also heard argument from

Mother's counsel about Father's extensive criminal history and Father's lack of contact with Child 3. Father's counsel responded that Father had completed "numerous portions" of his case plan and Child 3 was happy and excited to see Father during a recent supervised visit. Father's counsel then suggested that Mother was coaching Child 3. After considering all the evidence presented, both written and oral, the juvenile court found that "there's clear and convincing evidence of the circumstances stated in [section] 361 regarding [the Parents]." Thereafter, the court removed the physical custody of Child 3 from Father's care.

Although the court did not specifically state the factual basis for its removal order, the court clearly stated that it had considered all the evidence and found clear and convincing evidence that Parents were involved in domestic violence. As provided by the reports submitted by the Department, and summarized in detail *ante*, there is more than substantial evidence to support the court's finding that Parents both participated in domestic violence.

Father relies on *In re D.P.* (2020) 44 Cal.App.5th 1058 (*D.P.*) in support of his argument.

In *D.P.*, a child welfare department received a referral alleging that the minor's mother drove with the minor while under the influence of alcohol, and that she suffered from bipolar disorder. (*D.P.*, *supra*, 44 Cal.App.5th at p. 1061.) During the investigation the minor's father stated that he was afraid of the mother. The father, however, admitted that the mother was usually calm if she took her medication and abstained from alcohol.

19

(*Id.* at p. 1062.)  The mother destroyed the family's home during a "bipolar episode," threatened the father with a knife while he held the minor, and engaged in physical altercations in front of the social worker.  (*Id.* at pp. 1061-1063.)  The father obtained a permanent restraining order protecting himself and the minor from the mother.  (*Id.* at p. 1063.)  The mother then obtained a temporary restraining order protecting the mother, her older child, and the minor from the father.  (*Id.* at p. 1064.)  The mother admitted that she obtained the restraining order because the father had obtained one against her.  (*Ibid.*)  The order restraining the father was modified to remove the minor as a protected person.  The family court stated that it would not have issued the temporary order under those terms if the mother had been honest about the existence of the order restraining the mother.  (*Ibid.*)  The child welfare department filed a section 300 petition alleging that the minor was at risk of harm under section 300, subdivisions (a) and (b), due to mother's mental disorders and substance abuse.  (*Ibid.*)  The court then detained the minor from the mother.  (*Ibid.*)

Thereafter, the mother participated in drug testing, parenting classes, anger management classes, and individual therapy.  Moreover, the mother's visits with the minor were appropriate.  (*D.P.*, *supra*, 44 Cal.App.5th at p. 1064.)  At the disposition hearing, however, the juvenile court removed the minor from the mother's care, and ordered the mother to participate in reunification services.  The court specified that the minor was removed '"pursuant to Dependency Court order 415, [upon] the terms … contained in the minute order."'  (*Id.* at p. 1065.)

After the mother appealed, the appellate court agreed with the mother. The reviewing court held that "Dependency Court Order 415" could not replace a statement of facts supporting the court's decision to remove the child from a parent. (*D.P.*, *supra*, 44 Cal.App.5th at p. 1067.) The appellate court found that there were reasonable means to prevent the minor's removal. The juvenile court could have ordered the mother to leave the home and the minor could have safely remained in the home with the father due to the restraining order. (*Id.* at p. 1069.)

In this case, Father contends that as in *D.P.*, *supra*, 44 Cal.App.5th 1058, there was no need to remove Child 3 from Father's care because his relationship with Mother was over by the time the court issued its disposition orders. *D.P.* is not helpful to Father's argument because the facts in this case are distinguishable from the facts in *D.P.*

In *D.P.*, the father was a nonoffending parent. The mother admitted she applied for a restraining order only because the father had obtained one against her. Minor was taken off the restraining order against father. In contrast, in this case, Father is an offending parent. The domestic violence and accusations between the Parents date back for years. Mother never admitted that she obtained restraining orders against Father because he received one against her. Mother has consistently claimed that Father had harassed and continues to harass her, and that Father has physically abused her. In fact, Father had spent time in prison for reasons related to domestic violence—violating a restraining order against him by Mother. Moreover, Mother and the older children claimed that they lived in fear of Father. Father's reliance on *D.P.* is unpersuasive.

21

In sum, with the facts mentioned above in mind, we find that substantial evidence shows that removing Child 3 from Father's custody was necessary to protect Child 3's physical, developmental, and emotional well-being, and there were no other reasonable means by which Child 3's well-being could be protected without removing him from Father and Mother's custody.  (§ 361, subd. (c)(1).)

B.  *Monitored Visitation*

Father contends "that the visitation order denying his request for unmonitored visits was an abuse of discretion as it was supported by the evidence in the record."  We disagree and affirm the court's visitation order.

We review a juvenile court's visitation orders for abuse of discretion.  (*In re Julie M.* (1999) 69 Cal.App.4th 41, 48-51.)  A juvenile court is given wide discretion in determining the appropriate terms and conditions of visitation between dependent children and their parents.  (*In re Megan B.* (1991) 235 Cal.App.3d 942, 953.)  Visitation orders should include frequency and duration, and the court cannot delegate whether visits will occur to the social services agency, child, or therapist.  (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237; *In re Julie M.*, *supra*, at pp. 48-49; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1477-1478.)

Under the abuse of discretion standard of review, we discern that the court's visitation orders did not exceed the bounds of reason.  Here, the supervision of visitations between Father and Child 3 is more than justified given the facts in this case.  Father had

recently begun his reunification services, and visiting with Child 3 in a monitored setting. As provided *ante*, the court found that Father failed to make any progress toward alleviating or mitigating the causes necessitating placement. Moreover, the evidence submitted by the social worker showed that Father continued to send Mother harassing text messages. Mother and the older children claimed that they live in fear of Father. Furthermore, Child 1 stated that Father threatened Child 1 in the past and sent Child 1 threatening messages. In addition to Father's actions, although Child 3 appeared excited to see Father, Child 3 told his caregiver that he did not want to be alone with Father. Based on the record, we find that the juvenile court did not abuse its discretion in ordering supervised visitations between Father and Child 3.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

RAPHAEL
J.
MENETREZ
J.

23