Filed 6/10/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.O., a Person Coming Under Juvenile Court Law. | B339164 |
| | (Los Angeles County Super. Ct. No. 23CCJP03108) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| F.O., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

Linda S. Votaw, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel, for Plaintiff and Respondent.

_____

Can a parent appeal only the portion of a juvenile court's order finding that the parent received reasonable reunification services?  Yes.  Although we are not the first to answer affirmatively, we take this opportunity to address the issue in light of new developments in case law and legislation.

Appellant mother F.O. appeals the order the juvenile court made after the six-month review hearing.  She challenges only the court's finding that respondent Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable services.  Mother argues the finding is appealable because it is adverse to her interest in reunification and puts her at a significant procedural disadvantage.  DCFS counters that no appeal lies from such a finding but, in any case, substantial evidence supports it.

We conclude that Mother may appeal the reasonable services finding contained within the court's order because she is aggrieved by it.  An erroneous reasonable services finding can impair a parent's request for an extension of reunification services, thereby frustrating attempts at reunification.  It could even lead to the erroneous termination of parental rights.  However, we also conclude in this case that substantial evidence supports the reasonable services finding.  We therefore affirm.

2

# FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. *DCFS Investigates a Referral*

In September 2023, DCFS received a report that Mother's child A.O. (born December 2014) "had visible bruises on his face." The reporting party stated they "noticed bruises on the right side of the child's forehead and a red line that extends all the way to his ear," "a large bruise on his upper ear," "bruises on the left side of his face, starting with the forehead going behind the student's ear," and "a red mark behind the student's ear." The reporting party "indicated the child would not talk about it when asked."

A children's social worker (CSW) visited A.O.'s school and spoke with its police officers. The officers reported they wiped A.O.'s face with a wipe and "noticed some of the marks were dirt but then noticed that [he] had a bruised ear and other marks on his face." The officers informed the CSW that A.O. said Mother hit him because he was touching something, he was afraid to return home, and Mother "always" hit him. The officers also spoke with Mother, who claimed A.O.'s injuries "occurred at a park when the child was playing with other children and was hit on the face with a ball."

The CSW spoke with A.O. She noticed "a black and purple bruise covering about 80% of his right ear (the bruise expanded to the back of the ear), two scratches behind the right ear, a red mark on the left temple (the mark appeared to start on the child's hairline), and a red mark on the left jawline." When she asked A.O. what happened to his ear and face, A.O. responded Mother

---

[1] We limit our summary to the facts and procedural history relevant to the issues appellant raises on appeal.

"did like this," and mimed slamming his head into the wall three times. He denied being hit in the face with a ball. A.O. reported that when he gets into trouble, Mother hits him on the buttocks with something like a cord, hard enough to leave red and purple marks. A.O. also confirmed Mother pulled his ears. He said Mother "always" hit him when she got mad, and he did not want to go home to her because he was scared.

The CSW also spoke with Mother, who repeated her claim that A.O. was hit in the face with a ball while at the park two days ago. She denied causing the injuries, stating that had she hit A.O. in the head, he would be dead. She admitted to spanking A.O. on the buttocks with an open hand in the past but denied ever leaving any marks. Mother begged the CSW not to take A.O. from her and said what was happening was "[A.O.]'s fault" as "a child with autism cannot be trusted because they lie." Mother claimed A.O. would lie and steal and sometimes hit himself. Mother frequently spoke of others, such as A.O., her family, and her therapist, "betraying" her.

The CSW spoke with Mother's landlords. They reported "several months ago" seeing A.O. with a black eye and, when they asked him what happened, he said Mother "did it." But Mother told the landlords A.O. had fallen off his bed and hit his eye.

After a home visit in which the CSW informed Mother that DCFS would be seeking a removal warrant, Mother consented to A.O.'s removal. DCFS placed A.O. with a foster family.

### B. *The Court Detains A.O.*

Two days later, DCFS filed a petition on behalf of A.O. under Welfare and Institutions Code section 300, subdivisions (a)

and (b)(1).[2]  Counts a-1 and b-1 both alleged Mother "physically abused" A.O. by "repeatedly forcefully striking the child's head against a wall, inflicting a red mark to the left side of the child's head, a red mark to the child's left jawline, a black and purple bruise to the child's right ear and two scratches to the child's right ear."  The counts also alleged Mother gave A.O. a black eye, struck his buttocks with a cord hard enough to inflict red and purple marks, and pulled his ears.

At the September 2023 detention hearing, A.O. was initially present but, in the middle of the proceedings, informed his counsel he wanted "to go back to the shelter care room"; the court permitted A.O. to leave.  Later in the proceedings, counsel for DCFS requested visits occur in a therapeutic setting, stating he was "taken by [the] minor's reaction in court today."  Counsel for DCFS opined that while A.O. "appeared to be happy to see his mother . . . , there was some reluctance to remain in court today," and noted the "many reports" of physical abuse.  Minor's counsel joined in the request, "influenced by [A.O.]'s reaction in court today."  Mother's counsel asked the court to order only that the visits be monitored, stating that ordering therapeutic visits "given . . . the time it would take to get visits in a therapeutic setting, . . . that would, essentially, mean no visits at all for quite sometime [*sic*]."  The court observed that A.O. "seemed surprised to see his mother here.  Initially, it seemed as if he was eager to greet her, but he seemed to recoil at a certain point and then asked to leave."  The court detained A.O. from Mother and

---

[2] Undesignated statutory references are to the Welfare and Institutions Code.

5

ordered A.O.'s visitation with Mother occur "in a therapeutic setting."

## C.   *DCFS Continues Investigating*

At the beginning of October 2023, a CSW spoke with a coordinator for the California Department of Mental Health. The coordinator "said that it is difficult for a therapist to agree to monitor the visitation since that is not part of their job" and "indicated that a therapist will likely want to speak with the child first and assess when and if the child is ready to speak with the mother." The coordinator "recommended [DCFS] to speak with the MAT [Multidisciplinary Assessment Team] assessor and see what their recommendation[] is and to ask the court if [a specific service provider] would qualify." That same day, a CSW told Mother DCFS "was still looking for a therapist to monitor visits with the child." When the foster father noted in late October that A.O. was supposed to visit Mother in a therapeutic setting, a CSW informed him the "MAT Assessor would recommend mental health services."

In October 2023, a dependency investigator (DI) spoke with Mother. Mother maintained that A.O. received his recent injuries from being hit by a ball in the park. Mother also denied ever striking A.O. on the buttocks with a cord, scratching him, or pulling his ears. A maternal aunt told the DI that Mother would never hit A.O. The maternal aunt reported that she had cared for A.O. until he was five years old, and "[i]f he did not get his way, he would begin to hit himself and have tantrums."

The DI also spoke with A.O. and asked about the injuries alleged in the petition: scratches on the ear, a red mark on the jawline, and injuries to the side of his head.

6

When she asked A.O. how he injured his ear, he responded, "I was running at school." He added, "I was hitting myself," and pointed at an extension cord in the room. The DI noted A.O. "did not elaborate if he hit something or if someone hit him." Then A.O. said, "My mommy gets mad fast and she hits me. I don't know why."

When the DI asked A.O. how he injured his jawline, he repeated, "I was hitting myself" and again pointed to the extension cord. She asked if anyone had hurt him or scratched him on the jawline, and A.O. said, "I don't know."

When the DI asked how he injured the side of his head, A.O. stated, "A soccer ball hit me at the park." He elaborated that Mother was in the car when it happened.

The DI asked A.O. whether he wanted to return to Mother. A.O. said he did not, because "[m]y mommy hits me and she hurts me." When asked where she hit him, he pointed to his head and ears, and stated she hit him "when she gets mad[]."

At an October hearing, Mother's counsel requested the court permit Mother to have monitored virtual visits with A.O. because no therapeutic visits had yet to occur, and Mother had not had any contact with A.O. since the court detained him.[3] A.O.'s counsel responded that she had spoken with A.O. and asked the court to keep its previous orders in place. The court denied Mother's request.

---

[3] A DCFS report discloses the two had a telephone call the night DCFS removed him from Mother. Mother "was appropriate" and told A.O. she loved him; A.O. replied he loved her, too.

**D.** *The Court Removes A.O. and Orders Visits Only in a Therapeutic Setting*

In November 2023, DCFS filed an amended petition, striking count a-1 and modifying count b-1 by removing allegations that she "physically abused" A.O. and alleging instead that she "inappropriately disciplined" him—the substantive allegations regarding the types of injury Mother allegedly inflicted on A.O. remained.

At the November 2023 adjudication hearing, Mother pleaded "no contest" to the amended petition. Based on the plea, the court found the amended petition to be true.

Proceeding to disposition, counsel for DCFS requested Mother's visits "remain in a therapeutic setting." Counsel for A.O. concurred, informing the court that A.O. was not ready to see Mother at all, although he wanted to "eventually." Mother's counsel argued that the "very essence of reunification is visitation" and asked for monitored visits, again pointing out that Mother had not seen A.O. since detention. Counsel added that there was little physical risk to A.O. during a monitored visit. A.O.'s counsel agreed there was minimal physical risk but countered that the harm A.O. had explained to her was "much more psychological in nature." The court removed A.O. and ordered Mother's visits with him occur in a therapeutic setting.

**E.** *DCFS Continues Investigating*

A.O. had an appointment with a "Therapist / MAT assessor" for mid-December 2023, but the therapist rescheduled the appointment for January 2024. On January 10, 2024, DCFS's "Delivered Service Log" notes (in all capital letters): "Collaboration with counseling agency: individual therapy for child, therapeutic setting visits for family. [¶] . . . [¶] Agency will

8

assess matter and call back on 1/11/24 with follow up or determination."[4]  In a January 2024 visit from a CSW, the CSW informed A.O. that Mother missed him, loved him, and wanted to see him.  A.O. "had a slight emotional reaction; wide eyes, shrinking on his bean bag, [and] glossy eyes."  When the CSW asked if he wanted to see Mother, A.O. stated "no" and shook his head.  The CSW informed Mother that DCFS was trying "to secure a therapist with expertise in children with special needs, bilingual and willing to accommodate therapeutic setting visitations."  The CSW noted, "Since detention, [A.O.] has demonstrated preference [for] speaking English rather than Spanish; mother's primary language is Spanish."  Mother asked whether she could request A.O. speak Spanish and the CSW "advised [Mother] to allow the therapist to lead the discussion and mother to remain open to guidance."

From January to March 2024, A.O. received therapeutic services from the MAT assessor.  DCFS found a Spanish-speaking therapist for A.O. in March 2024.  In a March 2024 visit with a CSW, A.O. again stated he did not want to see or return to Mother.

In a May 2024 status report, DCFS reported A.O. was doing well in foster care, although he presented with significant behavioral issues at school.  A CSW stated he "avoids conversations about his mother."  The report also noted DCFS "encountered barriers locating a provider willing to facilitate the supervised setting visitation orders" and, as a result, Mother had

---

[4] The record is silent regarding any further call.

yet to have any contact with A.O. Moreover, DCFS believed A.O. "is not ready to begin contact with his mother."[5]

Mother participated in court-ordered programs, including a parenting program. She expressed "regret as to some of her actions." However, in a June 2024 last minute information to the court, DCFS reported that Mother's "position remains that she did not inflict injuries on the child." Another last minute information informed the court that A.O. was "making progress" and, at his last therapy session, seemed "neutral" about the topic of Mother. A.O.'s last therapy appointment was May 22, 2024, and his therapist believed that "[a] timeline of one month after he resumes sessions would be prudent" to schedule a visit with Mother in a therapeutic setting.

At the June 7, 2024 six-month review hearing, counsel for DCFS argued that A.O. was not yet ready to visit with Mother— let alone be returned to her care—because such visits would be traumatic for him. A.O.'s counsel concurred, adding that Mother still seemed to "lack insight into the case issues." Mother's counsel asked the court to find that DCFS failed to provide reasonable services to Mother because it made little effort to implement the court's therapeutic visitation order. He added it was inappropriate to permit A.O. to dictate whether visits occurred. Counsel for DCFS countered there could be no finding of "lack of reasonable efforts when the Department has done

---

[5] On April 24, 2024, A.O.'s therapist opined A.O. was "not ready" to see Mother and the therapist did not believe she could "push him" at this point in therapy. On May 29, 2024, there is a note in DCFS's "Delivered Services Log" that it asked the therapist again about A.O.'s readiness, but there is no entry discussing the therapist's response.

10

everything that is possible to make sure that the minor is receiving treatment, to make sure Mother is receiving education and services."

The court found DCFS "complied with the case plan by making reasonable efforts to return the child to a safe home and to complete any steps necessary to finalize the permanent placement of the child" and continued reunification services for Mother. Mother timely appealed.

### F.    *Post-Appeal Orders*

On our own motion, we take judicial notice of a minute order the juvenile court issued on January 30, 2025 at the 12-month review hearing, finding Mother's progress to be "unsubstantial." The order also noted, "Reunification services are continued for mother for the reasons stated on the record in open court" and "[t]he [e]xtension of Reunification services for six months is pursuant to WIC 352."

## DISCUSSION

### A.    *We Consider Mother's Appeal*

" 'Generally, a parent who is aggrieved by an order after judgment in a juvenile dependency proceeding may take an appeal from that order.' " (*In re T.G.* (2010) 188 Cal.App.4th 687, 692 (*T.G.*).) A " 'parent is aggrieved by a juvenile court order that injuriously affects the parent-child relationship.' " (*Ibid.*) We conclude that: (1) Mother may obtain review of the reasonable services finding by appealing the order in which it was made; and (2) she would be aggrieved by an erroneous reasonable services finding.

11

## 1. A Parent Can Obtain Review of a Reasonable Services Finding by Appealing the Order in Which It Was Made

Citing *T.G.*, Mother contends she may appeal the court's finding that DCFS provided reasonable services because the finding "put mother at a procedural disadvantage and was adverse to her interests in reunification."  Citing *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147 (*Melinda K.*), DCFS counters Mother may not appeal the reasonable services finding because "[s]he is not appealing any order of the court."  We find the reasoning in *Melinda K.* has been superseded by subsequent case law.

*Melinda K.* held that a parent could not appeal a reasonable services finding "unless the court takes adverse action based on that finding, because, in the absence of such action, there is no appealable order resulting from that finding." (*Melinda K.*, *supra*, 116 Cal.App.4th at p. 1154.)  *Melinda K.* concluded that "a petition for writ of mandate is the appropriate method by which to challenge a finding made by a juvenile court at a review hearing which does not result in an appealable order." (*Id.* at p. 1157.)[6]  But, as noted in *T.G.*, *Melinda K.*'s reasoning has been called into question by our Supreme Court's decision in *In re S.B.* (2009) 46 Cal.4th 529 (*S.B.*).

In *S.B.*, the appellant mother challenged the juvenile court's finding—made in an order after a section 366.26 hearing—that her children were probably adoptable.  (*S.B.*,

---

[6] Mother requested we alternatively consider her appeal as a petition for a writ of mandate.

12

*supra*, 46 Cal.4th at p. 534.)  The appellate court dismissed the mother's appeal, "reasoning that she was challenging only the *finding* that her children were probably adoptable." (*Ibid.*)  Our high court held this to be error, noting that "review of findings is normally obtained by appeal from the ensuing judgment or order." (*Ibid.*)  In other words, by appealing the section 366.26 hearing order, the mother could obtain review of a finding regarding adoptability made in that order.  The same reasoning applies here to permit Mother to obtain appellate review of a reasonable services finding.

> **2.     The Court's Reasonable Services Finding Would Be Adverse to Mother If Erroneous**

Notwithstanding their differing conclusions on appealability, both *T.G.* and *Melinda K.* recognized the potential negative impact of an erroneous reasonable services finding.  In *T.G.*, the appellate court reasoned that "a parent or child can [be] aggrieved by a reasonable services finding at the time of the six-month review hearing if it is not supported by substantial evidence" because "[s]uch a finding can put the interests of parents and children in reunification at a significant procedural disadvantage." (*T.G.*, *supra*, 188 Cal.App.4th at p. 695.)  In *Melinda K.*, the court recognized that a reasonable services finding "may have negative consequences at subsequent hearings." (*Melinda K.*, *supra*, 116 Cal.App.4th at p. 1150.)  We concur and conclude that an erroneous reasonable services finding "injuriously affects the parent-child relationship." (*T.G.*, at p. 692.)

To illustrate how a parent can be aggrieved by an erroneous reasonable services finding, we first explain the legislative scheme and its recent changes.

13

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).) Such services " 'enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.' " (*Ibid.*)

The Legislature has determined that reunification services may be provided for a certain time period and may be extended thereafter under certain circumstances. "[R]eunification services are generally limited to 12 months for a child over the age of three years," and in order for a parent to receive continued reunification services to 18 months, the juvenile court must find "there is a substantial probability that the child will be returned to the physical custody of the child's parent or guardian within the extended time period, *or that reasonable services have not been provided to the parent or guardian.*" (*T.G.*, *supra*, 188 Cal.App.4th at p. 695, italics added; see also § 361.5, subd. (a)(3)(A) ["court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent . . . if it can be shown, at the hearing held pursuant to subdivision (f) of Section 366.21, that the permanent plan for the child is that the child will be returned and safely maintained in the home within the extended time period. The court shall extend the time period only if it finds that there is a substantial probability that the child will be returned to the physical custody of the child's parent . . . within the extended time period, *or that reasonable services have not been provided to the parent*"], italics added.) In other words, if reasonable reunification services have

14

not been provided during the first 12 months of services, a court may extend services to 18 months.

In 2024, the Legislature clarified that reunification services can even be extended to 24 months if, among other findings, the court finds "reasonable services have not been provided to the parent."  (§ 361.5, subd. (a)(4)(A); see also § 366.22, subd. (b)(2)(A) ["Except as provided in paragraph (1) and subject to subparagraph (B), if the child is not returned to a parent . . . at the permanency review hearing *and the court finds that reasonable services have not been provided*, . . . the court shall extend reunification services for an additional six months"], italics added.)

Thus, under the legislative scheme, an erroneous reasonable services finding could impair a parent's request for more services, thereby frustrating the parent's attempts at reunification.  A parent who is not provided with reasonable services may have a harder time both in correcting the issues that brought the family to the attention of the juvenile court, and in convincing the court that the child can be safely maintained in the home.

Recent case law also illustrates how a parent can be aggrieved by an erroneous reasonable services finding.  In 2023, our Supreme Court held that where "deprivation of reasonable services does impede the juvenile court's ability to properly evaluate the prospects for family reunification, the trial court has an emergency escape valve: the discretionary authority under section 352 to continue a permanency planning hearing and extend reunification services in exceptional circumstances." (*Michael G.*, *supra*, 14 Cal.5th at p. 636.)  "A court's use of its discretionary authority under section 352 may be particularly

15

appropriate in cases where a parent has never received reasonable services during the reunification stage." (*Id.* at p. 633, fn. 9.) In other words, if reasonable services have not been provided, a court may use that finding when considering whether to exercise its discretionary authority to grant a parent's request under section 352 for further reunification services. Therefore, an erroneous reasonable services finding could impede the court's ability to fully and accurately evaluate that parent's request.

Moreover, as explained in *Michael G.*, section 366.26, subdivision (c)(2)(A) provides that a court "shall not terminate parental rights if . . . [a]t each hearing at which the court was required to consider reasonable efforts or services, the court has found that reasonable efforts were not made or that reasonable services were not offered or provided." (*Michael G.*, *supra*, 14 Cal.5th at p. 629.) As our high court noted, "Courts have interpreted this provision to 'preclude[] termination of parental rights when . . . the department has failed to offer or provide reasonable reunification services to a parent *throughout* the reunification period.' " (*Ibid.*)

In sum, *Michael G.* illustrates that an erroneous finding that DCFS provided a parent with reasonable services could impair any section 352 request that parent may make for further services at the 12-month review hearing, the 18-month review hearing, or beyond, thereby frustrating the parent's attempts at reunification.[7] It could even lead to the erroneous termination of parental rights.

---

[7] Thus, although the juvenile court ordered further reunification services for Mother at the 12-month review hearing, Mother's appeal is not moot because any request she makes for
*(Fn. is continued on the next page.)*

16

Thus, the statutory framework and the logic of *T.G.*, *S.B.*, and *Michael G.* compel our conclusion:  Because a parent is aggrieved by an erroneous reasonable services finding, the parent may obtain appellate review of the finding by appealing the order in which it was made, even if the parent is not challenging any other part of that order.  Here, even though Mother has already received an extension of services to 18 months, a previous finding that DCFS failed to provide reasonable services could allow her to argue for a further extension of services and against the termination of her parental rights.  We therefore consider her appeal.

### B.    *Substantial Evidence Supports the Court's Reasonable Services Finding*

At the six-month review hearing, "[i]f the child is not returned to their parent or legal guardian, the court shall determine by clear and convincing evidence whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the

---

more services at the 18-month review hearing or beyond could be hindered by the appealed finding.  An appeal is moot when " 'no effective relief can be granted.' " (*In re A.B.* (2014) 225 Cal.App.4th 1358, 1364.)  Here, should we find the juvenile court erred in its reasonable services finding, we can direct the court to strike that finding and enter a finding of no reasonable services, thereby granting effective relief.  (Cf. *In re D.N.* (2020) 56 Cal.App.5th 741, 758 [although court returned minor to mother's custody, father's appeal of juvenile court's finding that returning minor to his custody would create a substantial risk of detriment was not moot because "this finding 'may have collateral consequences' in this case"].)

17

continued custody of the child have been provided or offered to the parent or legal guardian . . . ." (§ 366.21, subd. (e)(8).) "When a finding that reunification services were adequate is challenged on appeal, we review it for substantial evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case." (*In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1451.)

"Visitation is an essential component of any reunification plan." (*In re Alvin R.*, *supra*, 108 Cal.App.4th at p. 972.) "Where the minor is reluctant to visit, and family therapy is needed to promote visitation, such therapy may be critical to reunification." (*Ibid.*) "But a parent's liberty interest in the care, custody and companionship of children cannot be maintained at the expense of their well-being." (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.) "While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' " (*Ibid.*) "This includes the 'possibility of adverse psychological consequences of an unwanted visit between mother and child.' " (*Ibid.*)

18

We acknowledge that at the time of the six-month review hearing, Mother had not yet been able to visit with A.O. But the record contains substantial evidence that DCFS made reasonable efforts to effect such visits in a way that would not further harm A.O.

In October 2023, even before the court's dispositional order, DCFS consulted with the Department of Mental Health for ideas on how to find a therapist to monitor the visits between Mother and A.O. In December 2023, one month after the dispositional hearing, DCFS arranged for A.O. to see a therapist.[8] In January 2024, DCFS spoke with a counseling agency regarding therapy for A.O. and "therapeutic setting visits for family." In March 2024, DCFS found a Spanish-speaking therapist for A.O.—while A.O. spoke English, Mother did not, requiring a Spanish-speaking therapist for therapeutic visits. In both April and May 2024, DCFS asked A.O.'s therapist about his readiness for visits with Mother in a therapeutic setting. Finally, the CSW tried to gently nudge A.O. toward visiting Mother, telling him in January 2024 that Mother loved and missed him, and then assessing his feelings again in March 2024.

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) On this record, we find that substantial evidence supports the

---

[8] The therapist rescheduled the December session to January 2024, but nothing in the record indicates DCFS knew of or caused the rescheduling.

court's finding by clear and convincing evidence that DCFS provided reasonable reunification services.

## DISPOSITION

The court's order is affirmed.
CERTIFIED FOR PUBLICATION

M. KIM, J.

We concur:

BENDIX, Acting P. J.

WEINGART, J.

20